[Montgomery Beer Bottling Works v. Gaston, Judge of Probate, etc.]

# Montgomery Beer Bottling Works v. Gaston, Judge of Probate, etc.

|126|425|
|130|169|

## *Action against Probate Judge to recover License Paid under Protest.*

1. *Legislation; what constitutes the journal of the House of Representatives.*—The bound volumes in which are transcribed in chronological order the daily proceedings and transactions of the House of Representatives, and which are signed by the Speaker and attested by the Clerk of the House, and filed in the office of the Secretary of State, constitute the Journal of the House of Representatives, within the meaning of the Canstitution and laws of the State, requiring a journal of the House of Representatives to be kept, in which is to be entered and recorded the proceedings had in the House of Representatives; and the notes or memoranda of each day's proceedings kept by the Clerk of the House, indicating each transaction in the House of Representatives, and from which are made up the bound volumes filed in the office of the Secretary of State cannot in any wise be considered as the journal of the House of Representatives.

2. *Same; the clerk of the House cannot alter the journal after it has been signed and filed in the office of the Secretary of State.*—After the Clerk of the House of Representatives has entered and recorded in the journal of the House the proceedings and transactions had at any particular session of the General Assembly, and such journal has been signed by the Speaker and attested by the Clerk, and filed in the office of the Secretary of State, as required by law, the Clerk has no further custody or control over said journal, and has no right or authority to alter such journal, or by interpolation to make a correction therein; the journal so prepared and signed and filed in the office of the Secretary of State being final evidence as to any proceeding had in the House of Representatives.

3. *Same; failure of journal to show passage of act of the Legislature, as provided by the Constitution, invalidates such act.* Where a bill is introduced in the House of Representatives, and after its passage by the House is amended by the Senate, and the Senate amendments were not concurred in by the House,

[Montgomery Beer Bottling Works v. Gaston, Judge of Probate, etc.]

and a conference committee is appointed by the two Houses ;and upon the report of the conference committee, the bill is subsequently passed, the failure of the journal of the House to ·show that said report of the conference committee was adopted by the House by a majority of its members voting for its adoption, in the manner required by the Constitution to make a legal enactment, invalidates such bill.

4. *Same; same; interpolation of the report and the vote thereon in the journal of the House after it is filed in the Secretary of State's office unauthorized.*—In such case, where the journal of the House of Representatives, as prepared and signed by the Speaker of the House, and attested by the Clerk, and filed in .the office of the Secretary of State, fails to show that the report of the conference committee was made and adopted by the House in the manner required by the Constitution, the subsequent correction of such journal by the interpolation .upon the margin of the page on which is shown the final passage of the bill, that this report was made and adopted as required by the Constitution to make it a legal enactment, is an unlawful interpolation in the journal, and is without any legal effect to give validity to the enactment of said bill.

5. *Same; same; same; case at bar* —The failure of the journal of the House of Representatives at the session of 1898-99, when prepared and filed in the office of the Secretary of State, to show that after. the amendment by the Senate of the "Act to amend the Revenue Laws of Alabama," (Acts of 1898-99, p. 164), and the appointment of a conference committee of both Houses, that the report of said conference committee was. made to and adopted by the House of Representatives in the manner required by the Constitution to make such bill a legal enactment, invalidates the whole act; and the subsequent correction of the journal, under the instructions of the Clerk of the House, by interpolating upon the margin thereof, the report and the vote by which it was adopted, in the manner required by the Constitution, is an unlawful interpolation, and without effect to give validity to such act.

APPEAL from the City Court of Montgomery.

Heard before the Hon. A. D. SAYRE.

This action was brought by Philip D. Puder, doing business under the name and style of the Montgomery Beer Bottling Works, against John B. Gaston, as Judge of Probate of Montgomery County, Ala., to recover the sums of $110 and $27.50 paid by Puder to Gaston as license tax in accordance with the provisions of "An

act to amend the revenue laws of the State of Alabama," approved Feb. 23, 1899, and commissions thereon.

The complaint, as filed, contained twelve counts. The first eight counts sought to recover from the defendant $110, which was paid by the plaintiff, as the agent for a foreign brewing company. The remaining four counts sought to recover $27.50, paid by the plaintiff as license tax as a retail dealer in spirituous, vinous and malt liquors. The cause was tried upon issue joined on plea of general issue.

On the trial, the following facts were disclosed: The plaintiff was engaged in business in the city of Montgomery, Ala., on the first day of January, 1899, and for several years previous, as well as on the 15th day of April, 1899, and at the time of bringing this suit; his business being of selling by retail spirituous, vinous and malt liquors, and also dealing in a certain beer known as the F. W. Cook Company's beer. He paid for and took out, on or about said first day of January, 1899, the State and county license at that time required of retail dealers in spirituous, vinous and malt liquors doing business in Montgomery. The beer known as F. W. Cook's beer was ordered by plaintiff from the F. W. Cook Brewing Co., at Evansville, Ind., where it is manufactured, by the carload; was paid for on arrival here by plaintiff, and sold by him in the regular course of trade by wholesale and retail, by the keg, bottle, or draught, on his own account, and over his counters, and also from wagons to other dealers. Said beer was bought by plaintiff outright and paid for in money or New York exchange. Plaintiff was not and never had been the agent of the F. W. Cook Brewing Co., and had never acted as such in any matter, but bought the goods from that concern and sold them for his own account as above stated. The F. W. Cook Company was and is a corporation under the laws of, and doing business in, the State of Indiana, where its brewery was located, and its goods or products were manufactured, and it has no established agency and paid no license in the State of Alabama. On or about April 15, 1899, James R. Stewart, as back tax commissioner for Montgomery county, reported to the judge of probate of Montgom-

428 SUPREME COURT [Nov. Term,

[Montgomery Beer Bottling Works v. Gaston, Judge of Probate, etc.]

ery county the name of the plaintiff as one who was doing business without a license, and that the plaintiff had failed to take out the additional license required of dealers in spirituous, vinous and malt liquors, under subdivision 65 of section 16 of the revenue law, approved Feb. 23, 1899, also that he had refused to take out a license for selling goods manufactured by a brewery in another State, as required by subdivision 14 of section 16 of said act. Said subdivision 14 was in words and figures as follows:

"14. For brewers, one hundred dollars. Every agency of a brewery of another State doing business in this State shall pay the same license; and any person, whether retail dealer or not, selling the goods or products of any such brewery, shall be deemed and held an agent, unless such brewery shall have an established agency in this State." Thereupon the probate judge, in accordance with the statute provided therefor, issued citations to the plaintiff requiring him to appear and take out said license. Upon the plaintiff, in response to said citation, appearing before the probate judge, he refused to pay the license imposed by said revenue law upon agents representing non-resident breweries, and also refused to pay the additional license as retailer in spirituous, vinous and malt liquors, as required by subdivision 65 of section 16 of said act. Thereupon Stewart, as tax commissioner, threatened plaintiff with immediate arrest and criminal prosecution unless the said license in both cases and the commissions provided for by the statute were paid. By reason of this duress, and under written protest, the plaintiff paid to J. B. Gaston, as Judge of Probate of Montgomery county, the sum of $100 required by said tax commissioner of the plaintiff for selling the goods manufactured by or the product of a brewery of another State, and the additional sum of $10 as commissions claimed by said commissioner thereon, and the sum of 50 cents to the probate judge for issuing said license.

The plaintiff also paid, by reason of such duress, and under written protest, the sum of $25.00 as additional license for retail dealer in spirituous, vinous

and malt liquors, and the sum of $2.50 as claimed by the tax commissioner for commissions, also a fee of 50 cents to the probate judge for issuing said license. The plaintiff then instituted the present action against the said John B. Gaston, as judge of probate of Montgomery county, to recover the said several sums so paid.    At the time of the trial the money sued for was in the hands of the probate judge.

Robert P. McDavid, the Secretary of State of Alabama, in answer to a *subpoena duces tecum* to bring with him the Journal of the House of Representatives of the regular session of 1898-99, produced the book referred to in the record as volume 2, Journal of the House of Representatives, which has been certified here by the court below, for the inspection of this court, and subsequently produced Vol. 1 of the same.    The Journal was signed by the Speaker of the House of Representatives and attested by its Clerk, and was deposited in the office of the Secretary of State within a few days after the adjournment of the regular session of the General Assembly of 1898-99.    On the margin of page 839 of volume 2, which was produced upon the trial by R. P. McDavid, in answer to the *subpoena duces tecum*, as the Journal of the House of Representatives, there appeared the following entry:

"Report of Committee of Conference.    Mr. Speaker, the undersigned, Committee of Conference, to consider the difference of the two Houses on H. B. 935, beg leave to report as follows:    After considering the matter, they recommend (1) the adoption of all the Senate amendments; (2) the adoption of the following additional amendments: 'Sec. ——.    Be it further enacted, that the dispensaries in each municipality shall pay 50 per cent. of such State and county license, as were paid by all the saloons in such municipality during the year 1898, payable quarterly, and in no case less than the amount paid by one saloon; by striking out the words 'or long distance telephones,' where they occur in the third and fourth line thereof; by inserting in line 19, after the word 'each,' and before the word 'company,' the word 'telegraph'; by inserting in line 16 of said section, after the word 'lines,' the following, 'and each

long distance telephone company, whose lines within the State do not exceed one hundred miles, shall pay at the rate of 50 cents per mile, and each long distance telephone company whose lines within the State exceed one hundred miles, shall day $250. Respectfully sumbitted. D. J. Meador, G. B. Deans, W. D. Jelks, on part of the Senate. J. J. Mitchell, W. W. Brandon, O. Kyle, on part of House.

"The House concurred in the conference report: Yeas, 52; nays, 0. Yeas—Messrs. Speaker, Andress, Arrington, Bayles, Box, Brandon, Brown, Bruner, Burkhalter, Byars, Cameron, Capps, Cheatham, Cofer, Collier, Cornelius, Dameron, Davidson, Davis, Flewellen, Forester, Fuller, Garner, George, Gibson, Greene, Harris, Haynie, Hood, Huey, Hurt, Kelly, Killen, Kyle, Lavretta, Long, Lyle, Matthews, Mitchell, McQueen, Patterson, Poole, Reynolds, Rogers, Sloan, Spears, Stodghill, Tate, Thigpen, Vaughn, Wallace, White.—52." The foregoing words contained in said marginal entry do not appear in any other place or part of either of the books introduced in evidence by the plaintiff as the Journal of the House of Representatives.

It was further shown that the book designated as volume 2 of this Journal remained in the office of the Secretary of State from the time it was deposited there after the adjournment of the General Assembly until about the 2d of May following— a space of about two months. On or about the 2d of May, 1899, at his request, the Secretary of State permitted Mr. Massey Wilson, who was the Clerk of the House of Representatives, to take volume 2 from his office. Messrs. Leon Weil and B. P. Crum, lawyers representing the plaintiff, each testified that prior to the time volume 2 was taken from the office of the Secretary of State, the marginal entry copied above was not upon page 839 of said volume; that they examined said record critically for the purpose of finding out whether or not the revenue law here involved had been properly enacted by the Legislature.

Hon Charles E. Waller, who was the Speaker of the House of Representatives, also testified that prior to the taking of volume 2 from the office of the Secretary of

State he examined said volume, and there was no marginal entry upon the page 839, of volume 2 of the House Journal. The other facts of the case, together with the descriptions of Vols. 1 and 2, introduced in evidence, and the batch of paper claimed by the defendant and described by the clerk of the House as the Journal of the House of Representatives, are sufficiently stated in the opinion.

The court, at the request of the plaintiff, gave to the jury the following written charges:

"1. Under the evidence in this case, the plaintiff is entitled to recover the money paid by him as a license tax under subdivision 14 of section 16 of the revenue law, approved Feb. 23, 1899,—the same being one hundred dollars and commissions of ten dollars,— claimed by the tax commissioner for selling goods manufactured by, or the product of, a brewery of another State.

"2. That under the evidence of this case, the plaintiff was not required to take out a license under subdivision 14 of section 16 of the revenue law, approved Feb. 23, 1899, for selling beer bought by him from the F. W. Cook Brewing Company."

To the giving of each of these charges the defendant separately excepted. In addition to these charges the plaintiff also requested the court to give to the jury the following written charges:

"1. If the jury believe the evidence, they must find for the plaintiff for the amount sued for in the 9th count of the complaint.

"2. If the jury believe the evidence, they must find for the plaintiff for the amount sued for in the 10th count of the complaint.

"3. If the jury believe the evidence, they will find for the plaintiff for the amount sued for in the 11th count of the complaint.

"4. If the jury believe the evidence, they must find for the plaintiff for the amount sued for in the 12th count of the complaint.

"5. The court charges the jury that the books introduced in evidence by the plaintiff marked 'Journal of the House of Representatives, volume 1 and volume

2,' are the true Journal of the House of Representatives of the regular session of the General Assembly of 1898-99.

"6. The court charges the jury that the Journal of the House of Representatives, of the regular session of the General Assembly of 1898-99, does not show that the report of the conference committee on the revenue bill, known as H. B. 935, was adopted by the House of Representatives by a vote taken by yeas and nays and recorded on the Journal."

The plaintiff separately excepted to the court's refusal to give each of these charges, and also separately excepted to the court's giving, at the request of the defendant, the following written charges:

"1. The court charges the jury that under the evidence in this case, the plaintiff is not entitled to recover the money paid by him as a license tax under an act entitled 'An act to amend the revenue laws of the State of Alabama,' approved Feb. 23, 1899,—the same being twenty-five dollars, and commissions of $2.50, claimed by the tax commissioner, and paid to the defendant for selling in the city of Montgomery, Alabama, spirituous, vinous or malt liquors.

"2. The court charges the jury that under the evidence in this case, plaintiff was required to take out a license as a retail dealer in spirituous, vinous or malt liquors, under the provisions of an act, entitled 'An act to amend the revenue laws of the State of Alabama,' approved February 23, 1899."

There were verdict and judgment for the plaintiff for $110. From this judgment, the plaintiff appeals, and assigns as error the several rulings of the trial court, to which exceptions were reserved by him. By agreement of counsel, there was a cross assignment of errors, in which the defendant assigned as error the giving of the two charges requested by the plaintiff.

LOMAX, CRUM & WEIL and THOMAS G. & CHAS. P. JONES, for appellant.—It is insisted that the entire act entitled "An act to amend the revenue laws of the State of Alabama," approved February 23, 1899, is unconstitutional, because the Journal of the House of

[Montgomery Beer Bottling Works v. Gaston, Judge of Probate, etc.]

Representatives shows that after the passage of the bill by the House of Representatives, it was amended by the Senate and the Senate amendments were not concurred in by the House by a vote of a majority of its members taken by yeas and nays, and the names of those voting for and against said amendments were not recorded in the journal; that a conference committee on the disagreement of the two Houses was appointed, and the journal of the House does not show that the report of the conference committee was adopted by the House, by a vote of a majority of the. members of the House voting for and against its adoption, taken by yeas and nays, and recorded upon the journal of the House. The language of the Constitution is imperative.—Constitution, Art. IV, § 22. It is essential, in order to determine this Constitutional question, to ascertain what constitutes the journal of the House of Representatives. In this connection there have been certified here, for the inspection of this court, two books and one bundle of papers, each contended to be the journal of the House of Representatives. The two books came from the custody of the officer designated by law to keep the journal of the House of Representatives, along with the public records—the Secretary of State—produced by him in answer to a subpoena *duces tecum* to bring the journal of the House of Representatives; they are in the shape and form in which the Journal has been kept from time immemorial; they bear the inscription, "Journal of the House of Representatives, Session 1898-9." "Vol. 1" and Vol. 2," and are signed by the Speaker, and attested by the Clerk of the House. The bundle of papers comes from a printing office in Florida, which had instructions not to destroy it, but no instructions to return it; had no shape and but little form; it was labelled "Fiftieth Day;" is a crazy-quilt patch-work of writing, some in ink, some in blue pencil, some in ordinary pencil, pasted slips of votes and other writing; is, in fact, a thing of "shreds and patches," which, happening to be signed by the Speaker and Clerk, is sought to have dignified by this court, by being set up as that solemn record of the proceedings of the House, which the Con-

situation commands the law-making power to keep. It is submitted that this bundle of papers is nothing but the private memoranda of the Clerk, from which the journal of the House,—the two books hereinabove mentioned,—is made. This contention is borne out by immemorial parliamentary law and the custom which has always prevailed in this State.—Cushing Law of Legislative Assemblies, § 423.

One great object of the constitutional requirement of keeping the Journal. is that legislative proceedings may be established with certainty and in enduring form for the guidance of the people and all the departments of the government: If the practice here attempted to be justified receives the approval of the courts, it frustrates and defeats this great design of the framers of the Constitution, and opens wide the door for uncertainty and confusion, and incites temptation to tamper with and change the most important of all public records. This position is further borne out · by what it is insisted has been the uniform and varying practice of this court since its organization, and most certainly since the case of *Jones v. Hutcheson,* 43 Ala. 721. If this immemorial practice of this court does not fix beyond recall that these books signed by the Speaker and clerk, in the custody of the Secretary of State, constitute the Journal of the House, it is expressly decided by this court in two cases, that as to the record of the votes by yeas and nays, the record is the Journal.—*The State ex rel. v. Buckley,* 54 Ala. 613; *Ex parte Howard-Harrison Iron Co.,* 119 Ala. 484.

It is further insisted that this court, by the language employed by the learned Chief Justice in the opinion in the case of *The State ex rel. Brickman v. Wilson,* 123 Ala. 259, recognized these books, then in the custody of the Secretary of State, as the Journal of the House of Representatives of the session of 1898-99.

GUNTER & GUNTER, and PILLANS, HANNAW & PILLANS, *contra.*—We submit that there is under the law and can be but one Journal of the House; that this is a well known and recognized thing; that it is a bound volume or volumes containing the record of the

daily transactions of the House, and filed in the archives of the State with the Secretary of State; that this Journal is amendable if it contains error by no power inferior to the Legislature itself, whose solemn Journal and record it is; and that it is this Journal to which this court has always appealed heretofore in cases where it became essential to refer to the Journal upon the law being questioned. In support of this is not only the common understanding and uniform experience of bench and bar, but also the authorities so far as we find any discussion or allusion to the matter. This court in the *mandamus* case growing out of the attempted alteration of this very journal reported under the name of the *State of Alabama ex rel. I. Brickman v. Massey Wilson and R. P. McDavid*, 123 Ala. 259, at the last term of the Supreme Court, distinctly recognized and declared this truth, the court saying: "It cannot be doubted, we think, and, is indeed quite obvious, that the Clerk's official connection with the original Journal, all his duties in respect to it—except the duty of copying it for the printer—ceases upon his delivering it *to the Secretary of State for safe keeping after it has been signed by the Speaker himself.*"—Code of 1896, §§ 2240, 1974.

Mr. Cushing, in his Law and Procedure of Legislative Assemblies, fully sustains this view. See §§ 327, 329, 416, 423, 425, 492.

He declared especially in section 426 that the Journal evidently meants the permanent record, and in section 492 that the minutes kept by the clerk from which the Journal is made up bear the same relation to the Journal that the docket entries do to the minute entries in the court, and that if a discrepancy exists the Journal controls. Other works on parliamentary law which we have found on briefs, but have been unable to consult, are: Barclay Dig. Parl. Prac. (1872); Wilson Dig. Parl. Law; May's Law and Usage of Parl. In *Detroit v. The Assessors*, 91 Mich. 86, the court held that the bound volume is conclusive, even against an official daily journal; presuming in favor of the bound volume that the House had amended the daily minutes.— *White v. Henton*, 3 Wyoming 753; *County of Santa*

[Montgomery Beer Bottling Works v. Gaston, Judge of Probate, etc.]

*Clara v. So. Pac.*, 18 Fed. Rep. 385, 427. Precisely in this line we find the Illinois court, which, under a constitution like ours, requires the Journal to show certain facts in order to the validity of the enactment, held that these being omitted from the journal, the law was invalid, save for the fact that the *same legislature* had afterwards amended this journal "from the facts shown *on the original minutes of the clerk of the house;*" and that the journal so amended sustained the law.—*Turley v. County of Logan*, 17 Ill. 151; *Commissioners v. Scruggs*, 131 N. C. 394.

Only by the same legislature can the journal be corrected.—*State v. Smith*, 44 Ohio St. 348; *McColulloch v. State*, 11 Ind. 424; *Detroit v. Assessors*, 91 Mich. 85. See also *State v. Jones* (6 Wash. 452), 23 L. R. A. 340; *State v. Christie*, 39 S. C. 307; *Carr v. Coke*, 116 N. C. 233, 28 L. R. A. 737; *Harwood v. Wentworth*, 42 Pac. Rep. 1028; *Lyons v. Woods*, 153 U. S. 649; *State ex rel. Sutherland v. Nye*, 42 Pac. Rep. 866; *Hunt v. Wright*, 70 Miss. 298; *Hollingsworth v. Thompson*, 45 La. An. 222; *State, Benton County v. Boice*, 140 Ind. 512; *Western U. T. Co. v. Taggart*, 141 Ind. 281.

HARALSON, J.—The only question we need consider on this appeal, according to the view we take of it, is the constitutionality of the "Act to amend the revenue laws of Alabama," approved February 23d, 1899 (Acts 1898-99, p. 164). The other question so elaborately discussed by counsel, of the constitutionality of the Fourteenth subdivision of section 16 of said act, must share the fate of the general enactment, of which it is a part, if that he held to be unconstitutional.

The question raised by the plaintiff on this appeal is, that said act of the 23d of February, 1899, was never constitutionally enacted, and is, therefore, void, because, as alleged, the journal of the House of Representatives shows that after the passage of the bill by the House, it was amended by the Senate, and the Senate amendments were not concurred in by the House by a majority of its members taken by yeas and nays, and the names of those voting for and against said amendments were not recorded in the journal, as required by section 22, Art. IV. of

[Montgomery Beer Bottling Works v. Gaston, Judge of Probate, etc.]

the Constitution, and that a conference committee of the two houses was appointed, and the journal of the House does not show that a report of that committee was made and adopted by the House by a majority of its members voting for and against its adoption, taken and recorded as required by said section of the Constitution. Just here the contention arises between the parties as to what constitutes the journal of the House,—the defendant insisting that a certain bundle of papers, purporting to be the fiftieth day's proceedings of the House, which show that on that day said revenue bill was, as contended, constitutionally passed, constitutes the journal of that day's proceedings; and the plaintiff, that two bound volumes in the Secretary of State's office, in which said day's proceedings purport to be recorded, but in which said conference report and its adoption by the House as required by the constitution does not appear, constitute the journal. The former shows that the alleged defect in the legislative proceedings, preventing the bill from becoming a law, does not exist, and the latter, as has been stated, that it does. The fate of the bill, therefore, must depend upon the determination of the question, which of these two,—the bundle of papers or the two volumes,—is the journal of the House. The said papers and the volumes have been certified to this court for inspection, together with all the evidence in the cause, bearing on the question, and are before us in aid of our judicial knowledge as to what constitutes the journal of the house; the same evidence having been introduced in the court below in aid of the judicial knowledge of that court.

The said bundle of papers consists of about 106 pages of paper fastened together at the upper left hand corner with a paper brad. The first page is headed "Fiftieth day's proceedings, Thursday, Feb'y. 23d, 1899." The pages are not numbered, and the writing on the different sheets,—some of which are shorter than others, and of different quality of paper,—is in ink and pencil, black and colored, and in different handwritings, and much of the contents of the sheets are also in typewriting. It contains many original senate and two original executive messages, with a statement in pen or ink of the action of

the house thereon; also appear rubber stamp memoranda of different transactions of that day's proceedings, and printed slips of the names of the members of the house, alphabetically arranged, showing the yea and nay vote on different propositions by pasting on other sheets a list of the names of members after the words "yea" and "nay," and showing the vote by striking out with pen or pencil, the names on these two lists, according to the vote of yea or nay of the members, respectively; also original reports and copies of reports of committees pasted on legal cap paper, concluding with the name of the speaker, attested by the clerk.

Among these papers is a sheet of legal cap paper on which is written in pencil, the same words and figures that appear on the margin of the page 839 of the second volume of the two bound books certified to us, and claimed by the plaintiff to be the true journal of the house. These papers do not purport to contain the proceedings of any day, except the last, or fiftieth day, of the session.

The books referred to were two large well and substantially bound record books, from $2\frac{1}{2}$ to $3\frac{1}{2}$ inches thick, one containing 600 and the other 853 numbered pages of written matter, the volumes being labeled on their backs "Journal of House of Representatives, Session 1898-9, volume 1 and 2." On the first page of the first volume are written the words "Journal of the House of Representatives, Session 1898-9. Montgomery, Ala., Nov. 15th, 1898;" the calling of the house to order, the swearing of the members, and the usual and customary proceedings of the organization of the house; each page contains a part of the proceedings of the house through each day, and the proceedings of the 25th day of the session, as appears on the last page of Vol. 1 are continued on the first page of Vol. 2. The proceedings of each day from the first to the fiftieth day each, inclusive, follow in regular chronological order, and at the end of the fiftieth day's proceedings in said second volume is the statement that the session adjourned *sine die*, and is signed by Charles E. Waller, Speaker of the House of Representatives, and is attested by Massey Wilson, Clerk. It is shown that on

page 839 of the second of these volumes the interpolation complained of,—which will be set out in full in the report of the cause, and may also·be found in the report of the case of *The State v. Wilson,* 123 Ala. 259—was made on the margin of said page, after the 2d of May, 1899, about two months after the final adjournment of the General Assembly, and after said volumes had been placed or filed by the Clerk in the office of the Secretary of State.

Charles E. Waller, the Speaker, testified for plaintiff, that he had examined the second volume of the book above referred to; that his signature as speaker appeared at the end of the writing in this volume; that the two volumes referred to are the journal of the House of Representatives for the session of 198-99, and that the proceedings transcribed into said books were signed by him a day or two after the adjournment of the session; that he signed the books, as the original journal of the House of Representatives; that the Clerk of the House kept on a board reports of committees and other papers, and from that (the reports and papers on this board) the journal was made, and that journal was just like a clerk would write what had taken place; that the Clerk kept a file, already referred to, on which were the reports of committees and other papers, and he signed that also, to go to the printer; that the journal of the House is correct history of·what takes place in the House, and " has no business with the original reports on it, and does not contain the original papers." Said Waller also testified that the last day's proceedings of the House were never read therein; that he had no knowledge that these books were ever in·the House; that the clerk never kept but one journal, and no other journal was ever presented to the House as its journal in any shape or form except the bound volumes, and that the papers referred to which the Clerk kept on a frame, were the data from which he had to write up the journal.

Massey Wilson, the Clerk, testified for defendant, that he kept a journal of the proceedings of the House on the fiftieth day; that the first thing he did with this —the fiftieth day's proceedings (in manuscript sheets)

[Montgomery Beer Bottling Works v. Gaston, Judge of Probate, etc.]

—was to turn it over to a clerk to be copied into volume 2 of the book testified about by others in the cause, and that he then sent it to the State printer at Jacksonville, Fla. This is the batch of papers above described, and claimed by defendant to be the journal of the House. Witness explained these papers by stating—to use his own language—that "as a step was taken in the House, a note was made of it, and after the House adjourned, I got it out and would write it up, and in doing that, if I could get some of the notes and use them by pasting them on the back of sheets, I would do it, and sometimes I would use a little rubber stamp when I could. These papers contain substantially or actually the same thing as appears on the marginal entry on page 839 of the book. These papers were made out first and the book copied from it; the papers were signed a very few days after we made them up.  *  *  * I put the clerk to making up the book (copying it) about ten or twelve days after the legislature first convened; the House had ten or twelve days' proceedings when I first begun copying that book. This whole book (referring to the book which witnesses for plaintiff testified about) is a transcription of the original papers, —the papers that I made up daily, and which papers I sent to the State printer. I have seen these books (referring to the books introduced in evidence by plaintiff) ; that is my signature at the end of that book (Vol. 2). After it was signed I left the books (Vols. 1 and 2) in the office of the Secretary of State.  *  *  * I never deposited with the Secretary of State the journal which I kept. The balance of this (referring to the papers kept by this witness, and introduced in evidence by defendant) is now in the hands of the printer in Jacksonville, Fla.  *  *  * I wrote the printer, after this suit begun, to send me by express, these papers, (referring to the papers which this witness testified he kept as the journal of the fiftieth day's proceedings) ; the printer wrote in reply that he had forwarded them, and when I got here this morning I received the papers from the Secretary of State, but they reached the Secretary of State last night.  *  *  * I never gave the printer in Florida or any one else any directions to

send these papers, or any part of them, back to me, until a week ago, but I directed the printer to preserve them, every sheet of them. It (the batch of papers) is the journal I sent the public printer. I get pay for copying; I was paid $400. I know how the marginal entry on page 839 of the second volume of the books introduced by the plaintiff came there; I directed it to be made shortly after the convening of the last extra session of the legislature."

Section 13 of Art. IV. of the present constitution contains the provision that "each House [of the General Assembly] shall keep a journal of its proceedings, and cause the same to be published immediately after its adjournment, excepting such parts as, in its judgment, may require secrecy; and the yeas and nays of the members of either House on any question shall, at the desire of one-tenth of the members present, be *entered on the journals.* Any member of either house shall have liberty to dissent from, or protest against, any act or resolution which he may think injurious to the public or an individual, and have his reasons for his dissent *entered on the journals.*" The words "entered on the journals," where they occur above, we have italicized for more convenient reference, as will be the case further on in this opinion, where we italicize in any quotation the words of the constitution or statutes of the State. In like manner, section 21, of the same article, requires the names of the members voting on the final passage of a bill to *"be entered on the journals,"* and section 22, requiring that no amendment to bills by one House shall be concurred in by the other, except by a vote of the majority thereof, taken by yeas and nays, and the names of those voting for and against, *recorded upon the journals.* Section 27 requires that the fact of the signing of bills and joint resolutions passed by the General Assembly *"shall be entered on the journal."* Section 13 of Art. V., in respect to the veto of the Governor, requires that his objections to the measure vetoed shall be returned to that House in which it originated, *"who shall enter the objections at large upon the journals,"* and again, in the same section, in requiring, in case the bill is passed over the veto, that "the names

of the members voting for or against the bill *shall be entered upon the journals of each House, respectively.*"

The statutory provisions in reference to the journals of the two Houses are as follows: Sec. 2221 of Code: "At the close of each session the Secretary of the Senate and the Clerk of the House of Representatives, and Secretary of State must select all the papers belonging to the General Assembly, except such as relate to unfinished business, and deposit them in the office of the Secretary of State."

Section 2222: "The engrossed copies of all laws and joint resolutions passed by the General Assembly, must be preserved by the chairman of the enrolling committee, and deposited in the office of the Secretary of State."

Section 2223: "The Secretary of the Senate, and Clerk of the House of Representatives must, within ten days after the adjournment of each session, assort all the papers and documents of their respective houses, relating to the unfinished business of the session, and arrange them as follows:"—(designating the class of papers).

Section 2240: "Within forty days after the adjournment of any session of the General Assembly the Secretary of the Senate and the Clerk of the House of Representatives must file and arrange the papers of their respective houses in the office of the Secretary of State, and copy and deliver to the public printer the journals of their respective house, with proper indexes thereto, and for such service when performed they shall receive respectively the sum of four hundred dollars."

Section 1974: It is the duty of the Secretary of State (amongst other things prescribed) "to keep the State seal, the original statutes and public records of the State, the records and papers belonging to the General Assembly, keeping the papers of each House separate."

The foregoing are our constitutional and statutory provisions touching the question of the kind of journal the Houses of the Legislature are required to keep.

We have decisions bearing on the question, to which reference must be made. It seems no doubt ever before arose in the legislature or professional mind as to what constitutes the journal. That one was required by law

to be kept, and what it should contain, all agree, and when, in judicial utterances, the journal has been referred to, it was done, as if everywhere and generally it was known what was meant by the term journal. Whatever else it may mean, it certainly does refer to the record which the Legislature keeps and is required to keep of its proceedings, and like all other records required by law to be kept, it imports absolute verity.—*The State v. Buckley*, 54 Ala. 613. It is one, and not two or duplicate journals or records that must be kept; and it cannot be that both the batch of papers and the two bound volumes,—placed before us from the Secretary of State's office,—together constitute the journal of the House. The one or the other is the journal required by law to be kept.——*State v. Wilson*, 123 Ala. 259. In that case, involving in another form, the matter here complained of in respect to the alleged interpolation into the journal of unauthorized matter, we said: "It cannot be doubted, we think, and it is indeed quite obvious, that the Clerk's official connection with the original journal —except the duty of copying it for the printer—ceases upon his delivering it to the Secretary of State for safe keeping after it has been signed by the speaker and himself. From and after that time, he has no custody of it, no control over it, no right to its possession except for the specific purpose above referred to, no power to alter it nor to prevent others from altering it, and is under no duty to keep it safely or to preserve it from mutilation or interpolation." This extract from that case is indulged to show that the journal, whatever it may be, is the *one* record required by law to be filed with the Secretary of State as the journal, as well as to show that it cannot thereafter be amended or added to by the Clerk. All our decisions refer to this memorial in the Secretary of State's office, as the record to which courts will look in ascertaining at last whether a statute has legal existence. In *Moody v. The State*, 48 Ala. 115, it was held that the journals of the two Houses of the General Assembly are public records, of which the courts will take judicial notice, and if it appears from them that an act was not passed according to the forms of the constitution, it will be held not to have the

force of law. In that case it appears from the opinion that the court examined the journal of the Senate at pages 458, 524, and House journal at page 560, in aid of their judicial knowledge. In that examination of the journals they gave the place in the Senate journal, containing the matter with which they had to do, as at page 458, showing that the journal was in the form of a record, with numbered pages. See also *Moog v. Randolph*, 77 Ala. 599; *Jones v. Hutchinson*, 43 Ala. 721. In *Wilson v. Duncan*, 114 Ala. 668, it appears, the court examined the legislative record on file in the office of the Secretary of State, called the journal, to correct an error in the published acts. See also *Ex parte Howard-Harrison Iron Co.*, 119 Ala. 484. In *State v. Wilson*, 123 Ala. 259, *supra*, where the integrity of the journal was assailed and sought to be corrected, in reference to this same interpolation upon its margin, the alleged change was referred to in Volume 2, p. 839, and this book was also referred to, throughout, as the journal, though it must be added, the question of what constituted the journal was not raised in that case.

For an inspection of the legislative records in the office of the Secretary of State, in aid of our judicial knowledge, we ascertain that in each of the cases above referred to, when the pages of the journals were given by the court, the number of these pages with an error in one instance which may be presumed to be typographical, are correctly stated as appear in well bound volumes similar to the ones before us for inspection in this case.

Mr. Cushing in his Law & Practice of Legislative Assemblies, section 415, says: "The official record of what is 'done and past' in a legislative assembly is called the Journal. It is so called because the proceedings are entered therein, in chronological order, as they occur from day to day; the business of each day forming the matter of a complete record by itself; hence the record is frequently spoken of in the plural as the journals." * * * "In the two houses of parliament the clerks take minutes of all the proceedings, orders and judgments of their respective houses as they occur, and make short entries of them in their minutes * * *

From these, and from the papers on file, it is the duty of the clerks afterwards to prepare the journals, in which entries are made at greater length, and with the forms more distinctly pointed out. * * * All persons may have access to the journals of the two houses in the same manner as to the records of courts." § 416. The same author furthermore says, section 422 : "A record or minute of the proceedings of a deliberative assembly of any kind is so essential to the convenient and efficient exercise of its functions that it must be considered as a necessary incident to the existence of every body. But the importance of having and preserving such a record of the votes and acts of a legislative body in a form accessible to the public, has been considered so great in this country as to be required by express constitutional provision." Still again he says, section 327 : "The clerk and his assistant attend at the table and take notes of the orders and proceedings; from which the votes, as they are called, are made up and printed each day, agreeably to the order of the house, 'under the direction of the speaker.' At the end of the session, it is the business of the clerk to see that the journal of the session is properly prepared, and fairly transcribed, from the minute books, the printed votes and the original votes as have been laid before the house." "The phrase 'to keep a journal' seems borrowed from the technical language, as the keeping of a journal corresponds to the practice of mercantile book keeping." § 423.

In the case of *The State v. Smith*, 44 Ohio St. Rep. 348, where the question was as to whether an act had been constitutionally adopted, the court touching the question as to whether resort might be had to parol evidence, to impeach the validity of its adoption, said : "Counsel have exhibited unusual industry in looking up the various cases upon the question; and, out of a multitude of citations, no one is found in which any court has assumed to go beyond the proceedings of the legislature, as recorded in the journals required to be kept in each of its branches, on the question whether a law has been adopted. And if reasons for this limitation upon judicial inquiry in such matters have not

generally been stated, it doubtless arises from the fact that they are apparent. Imperative reasons of public policy require that the authentication of laws should rest upon public memorials . of the most permanent character. They should be public, because all are required to conform to them; they should be permanent, that rights acquired today upon the faith of what has been declared to be law shall not be destroyed tomorrow, or at some remote period of time, by facts resting only in the memory of individuals."

As to the journals of the General Assembly required by the laws of this State to be kept, it may be said that the constitution and statutes as plainly imply as if they had contained the express language that these journals shall be in permanent, substantial book form, written or printed in ink. Thereby their greater accessibility and convenienec to their contents by all the public can be promoted, their keeping and handling rendered safer and easier, and their permanent preservation the better secured. All these considerations enter into the matter of keeping the journals, as required by law. Common and judicial knowledge alike assure us, that such has been the manner of making up and keeping these journals during the history of the State. Such journals as these are found and preserved in the archives of the State, for the examination of courts, lawyers and all interested parties. No other form of preserving the original legislative history of the State would subserve the constitutional and legislative requirements. Words are to be construed in their popular sense,—the plain sense in which the people generally understand them, unless it plainly appear from the writing in which they appear that they were intended to be employed in some other sense.—*Harrison v. The State*, 102 Ala. 170. That the word journal in popular use, and according to popular understanding, means such books as are kept for a journal of legislative proceedings in the Secretary of State's office, and not to a file of memorandum sheets from which it was made up, is too clear for dispute. This is in keeping, also, as we have seen, with similar requirements in respect to the journals of legislative bodies elsewhere, with no more

definite directions as to their keeping than ours, and is consonant with authority, public policy and common sense. What claims, let it be asked, has the batch of papers before us to be declared the journal of the House? It is as unsubstantial, as wanting in durability, convenience and qualities as a journal of legislative proceedings as can well be devised. As has been said, its pages are not numbered, and it is difficult of handling and examination, is not in proper documentary shape even for filing, and as the evidence clearly establishes, was never gotten up or considered as a final journal, such as the law directs to be kept. If so, why did the Clerk send it off to the public printer at Jacksonville, Fla., as a transcript of the journal, required by law to be made, from which to print the volume of legislative proceedings, called the printed journal? Section 2240 of the Code required him within 40 days after the adjournment of the session, to copy and deliver to the public printer, a copy of the journal of the House, and for such service, he was entitled to receive $400. The clerk swore he sent this batch of papers and similar batches of the other days' proceedings of the session to the printer in Florida without any instructions to return them, and not until the purposes of this suit required it was this particular batch ordered back by him. The other batches, as he shows, are still in Florida, and he never deposited these as the journal with the Secretary of State. He says also, he received for these papers the compensation allowed by law for a copy of the journal for the printer. If this was the original, what business had the printer in Florida with it, and if not a mere copy of the original, how could the Clerk treat it as a copy and get pay for making it as such under the statute? It clearly appears from his own evidence, as well as from the Speaker's, that he got it up to answer the purpose of a copy and to save himself the labor of making a transcript of the original journal as contained in these two volumes before us. He sent it off as a copy and got pay for it as such, and so far as appears, without intending reflection on the Clerk, it was never thought of as the legislative journal, until the necessity of this suit suggested it.

It may be asked again, how can such parts of the legislative proceedings as are required to be "entered on the journals," to be "entered at large on the journals," to be "recorded upon the journals," find a place in such a batch of papers as this? To record means to recite, repeat. and in the sense used in the constitution, to transcribe something upon the journal. To record and to enter upon are used synonymously in the constitution, and it is past the reasonable comprehension of the judicial mind to understand how a mass of paper tacked together as these are, and for the purposes intended, can furnish a convenient, permanent and safe receptacle for entering and recording the legislative proceedings required under our law. The tacking together of such papers is not the entry or recording upon the journals spoken of in the constitution.

Aided and instructed by the evidence before us, we declare as of our judicial knowledge that these books before us constitute the true and legal journal of the House of Representatives for the session of 1898-99, and said batch of papers cannot in any sense be considered as such. The journal shows that said conference report on the Senate amendments to the revenue bill were never concurred in by the House in the manner required by the constitution to make it a legal enactment, and for that reason the entire act must be held to be void and of no effect.

The writing on the margin of this journal at page 839 of what purports to be the conference report of the two Houses and its adoption by the House, placed there under the instructions of the Clerk, however honestly done and with the best of motives, which we do not question, was an unlawful interpolation of the journal, and is without any legal effect to give vitality to the enactment of said revenue bill.—*State v. Wilson, supra.*

It follows, the court erred in refusing to give the first six charges requested by plaintiff, and in giving the charges numbered 1 and 2 requested by defendant; and that it did not err in giving the charges numbered 1 and 2 requested by plaintiff. The judgment will be affirmed on the cross-appeal of J. B. Gaston as

[Hall & Farley, Trustees, v. Henderson;
Henderson v. Hall & Farley, Trustees.]

judge, etc., and on the original appeal, the judgment of the court below will be reversed and the cause remanded.

Affirmed on cross appeal.

Reversed and remanded on original appeal.