STATE, EX REL. JOHN F. CROCKER, V. GEORGE C. JUNKIN, SECRETARY OF STATE.

FILED JULY 12, 1907. No. 15,171.

1. **Statutes:** JOURNALS OF LEGISLATURE: SECONDARY EVIDENCE. Where the evidence furnished by the journals of the legislature is ambiguous or contradictory as to the actual time of its final adjournment, so that it is impossible to tell with certainty by an examination thereof upon what day the legislature adjourned *sine die*, recourse may be had to other competent evidence to show the actual fact and to supply the evidence which the journals fail to set forth.

2. ————: APPROVAL OF GOVERNOR. The governor, as respects approval or veto of bills, acts as a part of the lawmaking power, and may approve or reject within the time limited by the constitution, as long as bills remain in his possession and under his control.

3. ————: ————. The agreement of the secretary of state to consider a bill which the governor desired to file in his office with his objections thereto as having been filed, and the indorsement thereafter of the date of such consent as the date of the filing,

will not take the place of the actual filing, if the bill remains in the governor's possession, subject in all respects to his control and within his power to approve or reject.

4. ——: JOURNALS OF LEGISLATURE: SECONDARY EVIDENCE. Legislative journals examined, and *held* so ambiguous and contradictory as to the time the legislature adjourned *sine die* as to permit evidence *aliunde* to supply the facts.

ORIGINAL application for a writ of mandamus to compel respondent, as secretary of state, to authenticate a certain act of the legislature.    *Writ denied.*

*H. M. Sinclair, W. D. Oldham* and *T. F. Hamer,* for relator.

*H. J. Dobbs,* for intervener.

*W. T. Thompson, Attorney General,* and *Grant G. Martin,* for respondent.

*F. G. Hamer, amicus curiæ.*

LETTON, J.

This is an application for a writ of mandamus to compel George C. Junkin, secretary of state, to authenticate a certain act passed at the 1907 session of the legislature, entitled "A bill for an act to appropriate $85,000 to erect and equip the north and south wings of the main building for the state normal school located at Kearney, Nebraska." The petition alleges that the act was passed on the 3d day of April, 1907, that it was enrolled and duly signed while the legislature was still in session and capable of transacting business by the speaker of the house of representatives and president of the senate in the presence of the respective bodies over which each presided, and was presented to the governor of the state of Nebraska for his approval on the 4th day of April, 1907, at the hour of 11:15 A. M.; that the legislature adjourned *sine die* at 12 o'clock noon of said day, as shown by the journals of the respective branches of such body; that the governor did

not approve the bill nor did he file it with his objections thereto in the office of the secretary of state within five days after the adjournment of the legislature; that by reason of the premises the enactment became a valid law of the state, and that the respondent refuses to authenticate the bill by his signature thereon, as it is his duty to do.

The respondent admits the passage and signature of the bill as alleged in the petition. He denies it was presented to the governor for his approval at the hour of 11:15 A. M. on the 4th day of April, and alleges that it was not presented to or received by the governor until the hour of 2:45 P. M. on said day. He admits that the journals of the Thirtieth session of the legislature show the session to have adjourned on the 4th day of April, but alleges that the session did not in fact adjourn until about 4 o'clock P. M. of April 6. He avers that house roll No. 112 was filed in the office of the secretary of state on the 10th day of April, 1907, as shown by the indorsement thereon, within five days after the presentation of the bill to the governor and within five days after the adjournment of the legislature, and admits that he refuses to authenticate the bill. Ed S. Miller intervened in the case, and alleges substantially the same facts with reference to the passage and approval of house roll No 381, "A bill for an act authorizing the construction and furnishing of an additional fire-proof building at the institute for feeble minded youths located near Beatrice, Nebraska, making an appropriation therefor and providing for the expenditure of such appropriation."

There is but little dispute as to the facts in the case. Since the history of both acts is alike, we shall consider that of house roll No. 112. The act in question was passed and signed by the respective presiding officers of the two houses before noon on Thursday, the 4th day of April, 1907. It was presented to the governor the same day. He retained it without taking action thereupon until the night of Wednesday, the 10th day of April, when he caused to be prepared the following message to the

secretary of state: "April 10, 1907.   To the Honorable, The Secretary of State, Lincoln, Nebraska.   Sir: House roll No. 112 is respectfully delivered to you without my approval.   This is an act appropriating $85,000 to erect two wings to the Kearney normal school.   The appropriations for the coming biennium must be kept safely within the state's income.   In my judgment the necessities of this institution and the present condition of our finances do not warrant this expenditure.   George Lawson Sheldon, Governor."   About 11 o'clock P. M. of that day, after having prepared and signed this veto measure, the governor directed his chief clerk to go to the office of the secretary of state, and find out if any one was there who could receipt for this bill, together with others that he desired to deposit.   The clerk found no one at the office to receive the bills, the door being locked.   At the request of the governor he then called the secretary of state to the telephone at his home.   The governor then informed that officer that he had vetoed house roll No. 112, and several other bills, specifying the numbers of the bills, and said that he wished to deliver them to him before 12 o'clock that night, and asked if he would come down and receive the bills.   Mr. Junkin told him, if it was necessary, he would do so, that he preferred to have the bills delivered in the morning, but was willing to accept them and consider them in his possession that night.   The office of the secretary of state was closed about 5 o'clock in the afternoon, and remained closed until the next morning.   The secretary of state received actual possession of the bills upon April 11, in the afternoon, which he indorsed as received April 10.   It is further shown by parol testimony that the legislature continued in session, transacting business, during the afternoon of April 4, all of April 5, and until the afternoon of April 6, when it finally adjourned *sine die*.   The journals of both houses show that upon April 2 a joint resolution was adopted to adjourn at noon on April 4, and the last day's proceedings for the most part bear the date of April 4.

The relator contends that the journals of the legislature show that it adjourned *sine die* April 4, 1907, at noon; that the testimony of the secretary of state shows that house roll No. 112 was not delivered to him until the afternoon of April 11, more than five days, excluding Sunday, from that adjournment; and that consequently it became a law without the governor's approval at the expiration of the 5th day from the final adjournment, which was April 10; that the record of the legislature made by its journals imputes absolute verity, and cannot be contradicted by parol testimony; that the indorsement of the date of receipt by the secretary of state upon the bill as April 10, 1907, is not of such weight and dignity as a record that it cannot be impeached; and that, since it is shown clearly that the actual possession of the bill was retained by the governor until longer than the constitutional period, the bill became a law without his signature.

Section 15, art. 5 of the constitution, provides: "Every bill passed by the legislature, before it becomes a law, and every order, resolution or vote to which the concurrence of both houses may be necessary (except on questions of adjournment), shall be presented to the governor. If he approve he shall sign it, and thereupon it shall become a law; but if he do not approve, he shall return it, with his objections, to the house in which it shall have originated, which house shall enter the objections at large upon its journal, and proceed to reconsider the bill. If then three-fifths of the members elected agree to pass the same, it shall be sent, together with the objections, to the other house, by which it shall likewise be reconsidered; and if approved by three-fifths of the members elected to that house, it shall become a law, notwithstanding the objections of the governor. In all such cases, the vote of each house shall be determined by yeas and nays, to be entered upon the journal. Any bill which shall not be returned by the governor within five days (Sunday excepted), after it shall have been presented to him, shall become a law in like manner as if he had signed it; unless the legislature

by their adjournment prevent its return; in which case it shall be filed, with his objections, in the office of the secretary of state within five days after such adjournment, or become a law. The governor may disapprove any item or items of appropriation contained in bills passed by the legislature, and the item or items so disapproved shall be stricken therefrom, unless repassed in the manner herein prescribed in cases of disapproval of bills." The legislature by its adjournment prevented the return of the bill to that body by the governor within five days after it was presented to him. It was necessary therefore that it should be filed with his objections in the office of the secretary of state within five days after such adjournment, in order to give the veto effect.

The questions to determine are: First, whether the failure of the governor on April 10, the fifth day (Sunday excepted) from the adjournment as shown by the record, on account of the absence of the secretary of state from his office, actually to file the same in that office with his objections, the acceptance by the officer of a fictitious or constructive delivery, and the indorsement of the date of such constructive delivery upon the bill, constituted a filing in the office of the secretary of state; second, whether the legislature adjourned at noon upon the 4th day of April, or upon the afternoon of the 6th day of April. If parol evidence can be received to show the date of actual adjournment, which was upon April 6, the bill was actually filed in the office of the secretary of state within the constitutional period fixed for the veto to become effective.

1. We are of the opinion that the failure of the secretary of state to receive possession of the bill upon the 10th day of April, his agreement to consider the same as having been filed that day, and his indorsement showing the receipt of the same as of that date, cannot take the place of the actual filing of the bill with the governor's objections within the time limited by the constitution. The governor, in so far as the function of approval or

disapproval of bills is concerned, is a part of the lawmaking body. *Fowler v. Peirce,* 2 Cal. 165. His rights and his duties with respect to such functions are positively and clearly limited by the foregoing constitutional provisions. As long as the bill remained in his possession it was subject to his action. It was still within his power after he had notified the secretary of state by telephone that he had vetoed the bill, and before the bill with the accompanying veto was filed in the office of the secretary of state, to change his views as to the propriety of such legislation and to affix his approval to the measure. In such case we think there would be no question but that the act would become effective. So long as he was free to change his views, and to make such change effective by his approval, the bill was still susceptible to the exercise of the lawmaking power, and, until, by his voluntary action, the governor had put it beyond his power in any manner to affect the measure, he was still in as full and actual control of it as if he had never signed the veto message or notified the secretary that he desired to file it in his office. *People v. Hatch,* 19 Ill. 283; *Harpending v. Haight,* 39 Cal. 189. We think the intention to file the bill with his objections cannot take the place of actual filing, as long as the governor retained actual control and disposition over the document. We are also of the opinion that the indorsement of the secretary of state of the time of the receipt of the bill, while *prima facie* evidence, is subject to rebuttal to show the actual fact. It may be suggested that, if the secretary of state could, by the mere locking of his office door and refusal to receive a bill, put it out of the power of the governor to file the same, he might effectually deprive that officer of the veto power conferred upon him by the constitution, but this does not necessarily follow. Since the contingency may never arise, it is unnecessary to point out a method of action; but some means certainly could be found for the governor, in the endeavor to carry out the constitutional

requirement, to put the measure beyond his control and within that of the secretary of state.

2. Can we look beyond the legislative journals to ascertain at what time the actual adjournment of the legislature took place? We have held repeatedly that the enrolled bills and the journals of the two houses are the only competent evidence relative to the enactment of laws. *State v. Abbott,* 59 Neb. 106; *Webster v. City of Hastings,* 59 Neb. 563; *In re Granger,* 56 Neb. 260. We have also held that, when the legislative journals are defective, mutilated or incomplete, a missing portion of the record may be shown by evidence *aliunde. State v. Frank,* 60 Neb. 327. The doctrine which these cases declare is substantially that, when a fact is plainly shown to exist by the legislative journals, that fact is unimpeachable by other evidence. In *State v. Frank, supra,* the journals were defective and incomplete, and it is said by SULLIVAN, J., in the opinion : "When the journals are defective, mutilated or incomplete, their silence should not, as against the enrolled bill, be taken as evidence that the yeas and nays were not recorded as required by the constitution. The condition of the house journal, as a record of legislative action upon house roll No. 251, does not justify us in accepting it as an unimpeachable witness." It is a settled rule in this court that the court will take judicial notice of the contents of the legislative journals, and, in view of the importance of this case, we have examined the original senate and house journals of the legislature of 1907 deposited with the secretary of state. An examination of the original journals shows several hundred pages of matter containing resolutions offered and the vote upon the same, the passage of bills with the yea and nay vote thereon, reports of various committees, the contents of messages from the governor and from one house to the other, announcements by the respective presiding officers as to the signing of certain bills, together with much other miscellaneous matter. Most of the papers apparently forming the pages covering the last day's proceed-

ings are dated April 4. The house journal, however, under date of April 5, shows that the joint committee on engrossed and enrolled bills, at 9 o'clock P. M. of that day, presented to the governor for his approval and signature senate file No. 47, with twelve other bills, and another report of the same committee shows that, at 3:15 o'clock of that day, house rolls Nos. 293, 346, 396, 429 and 188 were presented to the governor. Under date of April 6, the journal shows that the joint committee on engrossed and enrolled bills reported that, at 2 o'clock of said day, they had presented to the governor house rolls Nos. 90, 91, 92, 147 and 161. The original senate journal, under a date line in which April "5th" is erased and "4th" written in, shows that 25 bills were presented to the governor by the joint committee that day, and, under a similarly changed date line, the senate journal shows that the joint committee on engrossed and enrolled bills report that, at 11:20 A. M. of that day, it had presented to the governor house rolls Nos. 293, 346, 429 and 188. The hour mark 3:15 is scratched out, and 11:20 apparently inserted on this page. These are the identical bills which the journal of the house shows were presented to the governor at 3:15 o'clock of April 5. The senate journal also shows, under a similarly changed date line, that the same committee presented to the governor, at 9 o'clock P. M., senate file No. 47, with twelve other bills, which are shown by the house journal to have been presented by that committee at 9 o'clock P. M., on April 5. The dates of certain reports made by the committee on accounts and expenditures are also changed from April 5 to April 4. Under date of April 6, changed to April 4, the senate journal shows that the committee on engrossed and enrolled bills presented to the governor, at 11:40 A. M., house rolls Nos. 90, 91, 92, *et seq.,* being the same bills which are shown by the house journal to have been presented to the governor upon April 6, at 2 o'clock, by the same committee. The majority of the pages bear the date line of April 4, but the fact that the journals of

the house and the senate contradict each other as to the day and hour with reference to the time that bills were presented to the governor, and the further fact that certain proceedings seem to have been had upon the 5th and 6th days of April, as shown by the house journal, and that dates in the senate journal appear to have been changed from the 5th and 6th to the 4th day of April, render the evidence of the journals contradictory, ambiguous and defective. It is shown by the record kept by the secretary of the governor, which has been introduced in evidence, that upon April 5, 1907, at 9 o'clock P. M., the governor received from the chairman of the committee on engrossed and enrolled bills senate file No. 47, and the other twelve senate files, which the house journal shows were delivered to him at that time, and which the senate journal apparently showed were delivered to him at that time, before the date was changed. The governor's record also coincides with that of the house journal in showing that upon April 5, at 3:15 P. M., the governor received house rolls Nos. 293, 346, 429 and 188. Both the house journal and the governor's record show that, at 2 o'clock P. M. upon April 6 the governor received house rolls Nos. 90, 91, 92, 147, *et seq.*, which the senate journal shows were presented to him by the committee under date of April 6, changed to April 4, at 11:40 A. M. The testimony of the clerk of the house and the secretary of the senate shows conclusively that no final adjournment was actually had until the afternoon of April 6. Indeed, it seems to be conceded that, pursuant to an ancient custom, more honored in the breach than in the observance, the legislative clocks were stopped at 12 o'clock noon upon April 4 in an attempt to carry out the fiction of adjournment at the date previously determined upon, although both houses continued in actual session for more than 48 hours thereafter.

In the two opinions written respectively by SULLIVAN, J., and NORVAL, C. J., in *State v. Frank*, 60 Neb. 327, and 61 Neb. 679, the manner of keeping the journals of the

legislature as practiced in this state was severely criti-
cised, and it is said: "A system better calculated to facili-
tate mistakes, or the loss, through either design or care-
lessness, of portions of the journal, could not well have
been adopted" (61 Neb. 679). If we should follow the
opinion of the supreme court of Alabama in *Montgomery
Beer Bottling Works v. Gaston,* 126 Ala. 425, 51 L. R.
A. 396, we would hold that the bundle of memoranda,
records of votes, reports of committees, etc., tied together
and deposited in the office of the secretary of state, do
not in fact constitute the legislative journals. We are
not prepared to go to this extent, however, but desire at
this time to again express our views as to the manner
which the legislature has provided for keeping such an
important record as the journal of its proceedings. If
better means were provided and closer attention were paid
by each member of the legislature to the making up of an
accurate record of each day's business, much of the uncer-
tainty as to the validity of our legislation would be done
away with. The case here is not one in which we have the
presumptive evidence of regularity furnished by a properly
enrolled bill, authenticated by the signatures of the pre-
siding officers of the house and senate, upon one side,
and a defective record on the other. In such case there
exists, or should exist, two records, the authenticated
bill and the journals, and the evidence furnished by the
presence in the proper archives of the enrolled bill in
proper form furnishes all evidence needed to prove its
passage ·as against incomplete or defective journals.
Here, however, it is the existence of a fact of which the
journals should furnish the only evidence which is in
controversy, and the evidence of which we must look to
the journals in the first place to supply. It is impossible
to tell with any certainty from the legislative record, as
preserved in the office of the secretary of state, at what
time the legislature of 1907 ceased the transaction of busi-
ness. A legislative record is like any other record, and,
when it is mutilated or ambiguous and contradictory, the

best evidence obtainable may be received, not to impeach it and make a new record, but to establish what was the actual fact. The journals of the legislature are confused, contradictory, uncertain and ambiguous in their recitals of what actually took place upon the 4th, 5th, and 6th days of April, and we are therefore at liberty to resort to other evidence; and, since such evidence shows conclusively that the legislature did not adjourn until April 6, and since the bills were actually filed with the governor's objections in the office of the secretary of state upon the 11th day of April, 1907, they were so filed within the five days limited by the constitution, and never became operative.

Aside from these considerations, it may be questioned whether in any event the legislature, by the simple expedient of stopping the hands of the clock while it still continued to transact business, could deprive the governor, and through him the people of the state, of the safeguard against hasty and illconsidered legislation provided by the time given after final adjournment for the consideration and filing of bills, with the governor's objections thereto, in the office of the secretary of state. The governor is a part of the law making machinery, as well as the house and senate, and his right to exercise the duties imposed upon him in a proper and orderly manner, and with the time for deliberation conferred upon him by the constitution, cannot be curtailed by the action of a co-ordinate branch of the lawmaking power. The people of the state are entitled to the benefit of the deliberate judgment of the executive upon the expediency and necessity of proposed laws and appropriations, and it cannot be taken away by a mere sham. To allow this to be done would be to say that the wise provision of the fundamental law could be nullified by a device so hollow and transparent as to be ridiculous—to prefer the shadow to the substance, and a falsehood to the truth.

The respondent is justified in refusing to certify the bills, and the writ prayed for is refused.

WRIT DENIED.