## No. 27939

## In Re Interrogatories of the Governor Regarding Certain Bills of Fifty-First General Assembly

(578 P.2d 200)

Decided April 10, 1978. Rehearing denied May 8, 1978.

---

J. D. MacFarlane, Attorney General, David W. Robbins, Deputy, Edward G. Donovan, Solicitor General, Mary J. Mullarkey, First Assistant, Joel W. Cantrick, Assistant, for the Governor.

Banta & Eason, Richard L. Eason, Stephen G. Everall, Eugene M. Sprague, for Committee on Legal Services of the General Assembly.

*En Banc.*

MR. JUSTICE GROVES delivered the opinion of the Court.

His Excellency, Richard D. Lamm, Governor of the State of Colorado, addressed three interrogatories to this court pursuant to Colorado Constitution Article VI, Section 3. These relate to nine bills which were enacted by the first regular session of the Fifty-First General Assembly of Colorado.[1] The interrogatories read:

"1. Were S.B. 115, S.B. 575, S.B. 580, S.B. 582, H.B. 1121, H.B. 1381, H.B.1535, H. B. 1589 and H.B. 1646 duly enacted by the fifty-first General Assembly when the Senate failed to take a vote by ayes and noes of the Senators then present in the chamber upon concurrence in a House amendment and/or upon adoption of the report of a committee of conference and/or upon final passage, as more particularly shown for each bill by the attached stipulation of facts and accompanying exhibits?

"2. Were the bills enumerated in question No. 1 (except S.B. 580) vetoed by Governor Lamm and were the twenty-four bills referred to in the attached stipulation of facts vetoed by Governors Love and McNichols, given that in each such case the following procedure occurred:

"(1) each bill was presented to the Governor and the General Assembly by its adjournment prevented return of the bill to it within ten days, and

"(2) each bill was disapproved by the Governor within thirty days after adjournment and was filed with the office of the Secretary of State more than thirty days after adjournment?

"3. Was S.B. 580 vetoed by the Governor when it was presented to the Governor and partially disapproved within ten days thereafter, not returned to the General Assembly prior to adjournment, and filed with the office of the Secretary of State after adjournment?"

---

[1] This session convened on January 5, 1977 and adjourned *sine die* on June 22, 1977.

A Stipulation of Facts executed by the Governor and by Senator Ralph A. Cole, acting for The Committee on Legal Services of the General Assembly, was filed with the interrogatories.

S.B. 580 will be discussed separately later in this opinion. Of the remaining eight bills, following action thereon by the General Assembly, one was delivered to the Governor on June 15, 1977, a second on June 16, 1977 and the other six on June 20, 1977. This session of the General Assembly adjourned *sine die* on June 22, 1977. The Governor did not return any of the bills to either house of the General Assembly. The Governor vetoed seven of the bills on July 15, 1977 and made a public announcement of his vetoes thereof on July 18, 1977. He vetoed the eighth bill on July 19, 1977 and on the same day made a public announcement of that fact. On July 27, 1977 he delivered each of the eight bills to the Secretary of State and on August 2 and 9, 1977 he delivered his veto letters, *viz.,* his statement of objections to the bills, to the Secretary of State.

It thus appears that: prior to the taking of any formal action by the Governor as to the eight bills, the General Assembly adjourned *sine die;* this adjournment was less than ten days from the time the bills were presented to the Governor; within 30 days after such adjournment the Governor vetoed the bills and made public announcement thereof; and the Governor did not file the bills with his objections in the office of the Secretary of State within 30 days of the adjournment.

The Colorado Constitution, Article IV, Section 11 provides:

"Every bill passed by the general assembly shall, before it becomes a law, be presented to the governor. If he approve, he shall sign it, and thereupon it shall become a law; but if he do not approve, he shall return it, with his objections, to the house in which it originated, which house shall enter the objections at large upon its journal, and proceed to reconsider the bill. If then two-thirds of the members elected agree to pass the same, it shall be sent, together with the objections, to the other house, by which it shall likewise be reconsidered, and if approved by two-thirds of the members elected to that house, it shall become a law, notwithstanding the objections of the governor. In all such cases the vote of each house shall be determined by ayes and noes, to be entered upon the journal. If any bill shall not be returned by the governor within ten days after it shall have been presented to him, the same shall be a law in like manner as if he had signed it, unless the general assembly shall by their adjournment prevent its return, in which case it shall be filed with his objections in the office of the secretary of state, within thirty days after such adjournment, or else become a law."

In his first interrogatory, the Governor has inquired as to whether the nine bills were duly enacted by the General Assembly; and in that connection the Attorney General has argued on behalf of the Governor that they were not duly enacted. We conclude that they were duly enacted, but the

discussion of this question will be found later in this opinion.

### I.

◼ We first address ourselves to the first question submitted in the Governor's second interrogatory, namely, Were the purported vetoes of the eight bills valid? Our answer is in the negative. Without the required filing of the bills and objections with the Secretary of State within the 30-day period following adjournment, the Governor's actions had no effect and the bills became law.

The argument submitted on behalf of the Governor is to the following effect:

"The United States Constitution permits the President to exercise a 'pocket veto' as to bills presented to him within ten days prior to adjournment of the Congress. *U.S. Const.* Art. I, §7(2). During the days of the Territory of Colorado, the territorial governor had a similar power of 'pocket veto' as to bills presented to him by the legislative assembly of the territory. 12 U.S. Stat. at L., p. 700. When our Colorado Constitution was adopted its provisions (above quoted) abolished the 'pocket veto', by which through the executive's inaction bills fail to become law without any explanation by the executive.

"It follows, that the reason in the Colorado Constitution for the 30-day filing with the Secretary of State of the vetoed bill and the objections thereto is to make the Governor *publicly* accountable by giving to the people a statement of the reason for his disapproval of the bill. 'The essence of the post-adjournment veto power then is gubernatorial action plus public announcement thereof.' If the Governor within 30 days following adjournment makes a public announcement of his objections to a bill which he has vetoed, the only remaining purpose of the 'provision requiring filing of a disapproved bill in the office of the secretary of state is to memorialize the evidence of the governor's actions.' Under the circumstances here, the filings more than 30 days after adjournment should not render the disapprovals invalid. There was substantial compliance with the constitutional requirements."

We do not agree with the second paragraph of the foregoing paraphrased argument.

A similar constitutional provision was under consideration in *Capito v. Topping,* 65 W. Va. 587, 64 S.E. 845 (1909). We quote a portion of that opinion, written for a unanimous court by Judge Poffenbarger:

"Constitutional provisions are organic. They are adopted with the highest degree of solemnity. They are intended to remain unalterable except by the great body of the people, and are incapable of alteration without great trouble and expense. They are the framework of the state as a civil institution, giving cast and color to all its legislation, jurisprudence, institutions and social and commercial life, by confining the legislature, the executive and judiciary within prescribed limits. All the great potential, dominating,

creative, destroying and guiding forces of the state are brought within their control so far as they apply. Thus, to the extent of their duration, they define and limit the policy of the state more rigidly and unalterably than the sails and rudder of the ship, when set, govern and control its course. . . . We are aware of no decision authorizing the view that a constitutional clause, dealing with matters so high and vital in character as the executive power of veto, and the making of laws, and having form and terms so emphatic, is merely directory."

 We realize that at times constitutions must be interpreted in the light of changing times and circumstances. Nevertheless, under the circumstances of this case, the views of Judge Poffenbarger are applicable. Our constitutional provision is perfectly plain and emphatic. It states that, if the adjournment of the General Assembly prevents the return of the bill, "it shall be filed [by the Governor] with his objections in the office of the secretary of state,within thirty days after such adjournment *or else become a law.*" (emphasis added).

The Attorney General argues rather persuasively that the purpose of the constitutional provisions has been accomplished by the public announcements of the vetoes and the reasons therefor. Here the mandatory constitutional language leaves no room for the type of functional interpretation sought by the Governor. *See Croissant v. DeSoto Improvement Co.,* 87 Fla. 530, 101 So. 37 (1924); *In re Opinion to the Governor,* 44 R.I. 275, 117 A. 97 (1922); *State v. Junkin,* 79 Neb. 532, 113 N.W. 256 (1907); and *State v. Norton,* 21 N.D. 473, 131 N.W. 257 (1911).

II.

The stipulation contains a statement to the effect that from 1957 to 1976 preceding governors of this state filed 24 vetoed bills with the Secretary of State more than 30 days after adjournment of the General Assembly. The remaining portion of the Governor's second interrogatory inquires as to the validity of these vetoes.

 Under Colorado Constitution Article VI, Section 3, we may give our opinion upon inquiry of the Governor "upon important questions upon solemn occasions." It has not been demonstrated to us that the validity of these vetoes during the past 20 years involves important questions upon solemn occasions. We are given no clue as to what bills were vetoed. We have not been advised as to whether they were published in the Session Laws of Colorado, the codifications of our laws, or the supplements thereto. The statutes contained in C.R.S. 1963 and C.R.S. 1973, respectively, were reenacted by the General Assembly. Each year the General Assembly has reenacted the statutes contained in the cumulative supplements to the decennial codifications. The General Assembly has yet to act as to the contents of the 1977 cumulative supplement to C.R.S. 1973, and our answers to interrogatories probably will govern its actions as to the inclusion of bills presented by the First Regular Session of the Fifty-First

General Assembly. No such consideration can be involved as to preceding sessions.

### III.

The third interrogatory of the Governor is, in effect, whether his purported veto of S.B. 580 was valid. We answer in the negative and rule that S.B. 580, in its entirety, became law on the expiration of ten days from the time it was presented to him.

S.B.580 was a supplemental appropriation to the Department of Revenue. It was enacted by the General Assembly and delivered to the Governor on June 10, 1977. It was then "partially vetoed by notation and signature on June 20, 1977." It was not returned to the Senate, the house of origin, but was filed with the Secretary of State on August 2, 1977.

Vetoes of appropriation bills are treated by *Colo. Const.*Art. IV, §12, which provides:

"The governor shall have power to disapprove of any item or items of any bill making appropriations of money, embracing distinct items, and the part or parts of the bill approved shall be law, and the item or items disapproved shall be void, unless enacted in manner following: If the general assembly be in session, he shall transmit to the house in which the bill originated a copy of the item or items thereof disapproved, together with his objections thereto, and the items objected to shall be separately reconsidered, and each item shall then take the same course as is prescribed for the passage of bills over the executive veto."

It is to be observed that §12 contains no time limitations within which the Governor must exercise his veto power. Since the preceding §11, already quoted, applies to "Every bill passed by the general assembly," §12 must be read in conjunction with §11 as to time limitations. *See Dickinson v. Page,* 120 Ark. 377, 179 S.W. 1004 (1915). *See also Wheeler v. Gallet,* 43 Idaho 175, 249 P. 1067 (1926); *Wood v. State Administrative Board,* 255 Mich. 220, 238 N.W. 16 (1931); *Mills v. Porter,* 69 Mont. 325, 222 P. 428 (1924); *State v. Forsyth,* 21 Wyo. 359, 133 P. 521 (1913).

The 10-day limitation in §11 applies to the Governor's attempted veto of S.B. 580. He did not follow the constitutional mandate that "he shall return it with his objections, to the house in which it originated . . . within ten days after it shall have been presented to him." The same reasoning which we have applied to the eight attempted post-adjournment vetoes applies with equal force to this attempted pre-adjournment veto of S.B. 580. Since it was not returned to the Senate with his objections within ten days after it had been presented to him, it then became law.

Before passing to the next subject, we mention that neither in the stipulation nor in anything else before us does it appear that the Governor made a public announcement of his partial vetoes of S.B. 580.

## IV.

The effect of the Governor's first interrogatory is to inquire whether, by reason of Senate action — or inaction — all nine bills mentioned earlier in this opinion were duly enacted.

The Colorado Constitution, Article V, Section 22 and 23 provides:

"Section 22. Reading and passage of bills. Every bill shall be read by title when introduced, and at length on two different days in each house; provided, however, any reading at length may be dispensed with upon unanimous consent of the members present. All substantial amendments made thereto shall be printed for the use of the members before the final vote is taken on the bill, and no bill shall become a law except by a vote of the majority of all members elected to each house taken on two separate days in each house, nor unless upon its final passage the vote be taken by ayes and noes and the names of those voting be entered on the journal."

"Section 23. Vote on amendments and report of committee. No amendment to any bill by one house shall be concurred in by the other nor shall the report of any committee of conference be adopted in either house except by a vote of a majority of the members elected thereto, taken by ayes and noes, and the names of those voting recorded upon the journal thereof."

The contention is submitted on behalf of the Governor that these bills were not duly enacted as there was not a vote as to each "taken by ayes and noes."

Under the provisions of the stipulation, there was submitted to us the Senate Journal of the First Regular Session of the Fifty-First General Assembly and certain tape recordings of certain action taken by the Senate in connection with the nine bills mentioned earlier in this opinion.

The contention of the Governor is predicated upon the apparent showing by the tape recordings that a "present roll call" or a "previous roll call" was used in connection with votes upon final reading, concurrence in a House amendment, adoption of a conference committee report, and passage of a bill as amended.

The definitions of "present roll call" and "previous roll call" are contained in the Attorney General's brief as follows:

"In Senate practice, the phrase 'present roll call' refers to the morning 'present/absent' roll call of the Senators with the addition of all Senators who have appeared in the chamber subsequent to the morning roll call but without deletions for any Senators who have left the chamber. When the Senate adopts by reference a 'present roll call', the practice is to equate 'present' with 'aye' and 'absent' with 'no'. When the Senate adopts by reference a 'previous roll call', the practice refers to a prior 'present roll call' or some other 'roll call' occurring earlier in the same day."

The following is taken from the brief of the General Assembly's Committee on Legal Services:

"The method of voting employed with regard to the bills in question on the various occasions for voting as set forth in the Stipulation of Facts can be briefly described as follows:

1. A member of the Senate moves the passage of a bill upon final reading or concurrence in a house amendment, or adoption of a conference committee report, or passage of a bill as amended;

2. Either the moving Senator or the presiding officer of the Senate then suggests that the previous roll call be adopted or utilized as the roll call on the matter before the Senate;

3. The presiding officer of the Senate then asks if there are any objections to the use of the previous roll call;

4. Upon the question of whether there is an objection to the use of the previous roll call, members of the Senate are provided with the opportunity to either demand a roll call or request that their vote on the previous roll call be changed.

"Counsel for the Committee on Legal Services of the General Assembly urge that this manner of voting constitutes a vote taken by ayes and noes within the meaning of the Colorado Constitution. Admittedly, the roll of the Senate is not called with each Senator verbally responding 'aye' or 'no'. Every Senator is, however, given full and ample opportunity to make it clear that he is voting for or against a given matter."

We turn now to the Attorney General's brief:

"The recorded votes on S.B. 115 are representative of the Senate's interpretation of the aye and no vote requirement. Tape No. M2T-77-12A, beginning at time 9:10:13, records the proceedings in the Senate on the third reading (*i.e.,* final passage) of S.B. 115. The presiding officer put the question to the Senate, asked the body if there were any objections to the use of the 'previous roll call' and, hearing none, declared that the result of the vote on third reading of S.B. 115 would be the same as the 'previous roll call.' In another instance, when the Senate adopted the conference committee report on S.B. 115, the calling of the roll was accomplished when the presiding officer put the question, asked the body if there were any objections to the use of the 'present roll call' and, hearing several objections, announced the results as being that of the 'present roll call', with certain modifications reflecting those Senators objecting."

The entries in the Senate Journal as to action on S.B. 115 on June 3, 1977 appear as follows:

S.B. 115 by Sen. Don Sandoval—State Employee Grievances

Senator Schieffelin moved for the adoption of the First Conference Committee Report on S.B. No. 115 (printed in Senate Journal, May 17, page 1809-1810).

The motion was declared adopted by the following roll call vote:

| | Aye | No | N.V. | | Aye | No | N.V. | | Aye | No | N.V. | | Aye | No | N.V. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Allshouse | • | | | Gallagher | • | | | MacManus | • | | | Smedley | | | • |
| Anderson | • | | | Groff | • | | | McCormick | • | | | Soash | • | | |
| Bishop | • | | | Harding | • | | | Meiklejohn | | • | | Stewart | • | | |
| Cole | • | | | Hatcher | | • | | Noble | • | | | Stockton | • | | |
| Comer | • | | | Holme | • | | | Phelps | | • | | Strickland | • | | |
| Cooper | • | | | Hughes | • | | | Plock | • | | | Wham | • | | |
| Decker | • | | | Kadlecek | • | | | Sandoval, D. | • | | | Woodard | • | | |
| Fowler, H. | • | | | Kinnie | • | | | Sandoval, P. | • | | | Wunsch | • | | |
| Fowler, L. | • | | | Kogovsek | • | | | Schieffelin | • | | | | 31 | 3 | 1 |

The question being "Shall the bill, as amended, pass?", the roll was called with the following result:

| | Aye | No | N.V. | | Aye | No | N.V. | | Aye | No | N.V. | | Aye | No | N.V. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Allshouse | • | | | Gallagher | • | | | MacManus | • | | | Smedley | | | • |
| Anderson | • | | | Groff | • | | | McCormick | • | | | Soash | • | | |
| Bishop | • | | | Harding | • | | | Meiklejohn | | • | | Stewart | • | | |
| Cole | • | | | Hatcher | | • | | Noble | • | | | Stockton | • | | |
| Comer | • | | | Holme | • | | | Phelps | | • | | Strickland | • | | |
| Cooper | • | | | Hughes | • | | | Plock | • | | | Wham | • | | |
| Decker | • | | | Kadlecek | • | | | Sandoval, D. | • | | | Woodard | • | | |
| Fowler, H. | • | | | Kinnie | • | | | Sandoval, P. | • | | | Wunsch | • | | |
| Fowler, L. | • | | | Kogovsek | • | | | Schieffelin | • | | | | 31 | 3 | 1 |

The foregoing is representative of the entries in the Senate Journal of votes on final passage, upon adoption of conference committee reports and upon concurrence in House amendments.

The stipulation states: "The parties do not stipulate as to the legal effect of the Senate Journal and the tape recordings."

■ From the presentations made to us we conclude that the nine bills were duly enacted. Our reasons follow:

A. The journals, unlike the tape recordings, are the constitutionally prescribed records of the Senate. Colorado Constitution, Article V, Section 13 provides:

"Each house shall keep a journal of its proceedings and publish the same, except such parts as require secrecy, and the ayes and noes on any question shall, at the desire of any two members, be entered on the journal."

■ B. Neither the Colorado Constitution nor the statutes of Colorado contain any reference to or authorization for tape recordings. No

provision is made in the rules of either the House or of the Senate concerning the use of tapes as journals. Rule No. 28 of the Joint Rules of the Senate and House of Representatives of the State of Colorado is the only reference to the tapes to be found in the rules of the General Assembly. This rule provides:

"The magnetic tapes of any meeting held in the capitol building of the General Assembly or either house thereof, whether created by statute, by resolution, or rule of either house, or by joint resolution or joint rule of the General Assembly, shall be recorded and stored in accordance with the following policies and procedures:

(1) Two identical tapes are to be made initially.

(2) One tape is to be transferred to the State Archivist as soon as practicable after it is removed from the recorder. A duplicate copy of the tape shall be transferred to the Legislative Information Center of the General Assembly.

(3) The State Archivist shall store and maintain the tapes delivered to him.

(4) The tapes delivered to the Legislative Information Center shall be kept therein until the beginning of the next regular session of the General Assembly.

(5) All tapes shall be available for use by the public during the regular office hours of the Division of State Archives and Public Records and the Legislative Information Center.

(6) The Director of Research of the Legislative Council shall be, and is herein designated as, the official custodian of all of the tapes."

There is nothing in this joint rule which purports to give authority, even if such authority could be given, for the tapes to be used in impeachment of the journals. The Senate Journal here involved was properly certified and, as already mentioned, constitutionally authorized. The tapes not only are not certified, but we know of no provisions providing for any certification. In sum, we do not find sufficient basis for use of the tapes in attempted impeachment of the journal entries here involved. *See People v. Leddy,* 53 Colo. 109, 123 P. 824 (1912); *Andrews v. People,* 33 Colo. 193, 79 P. 1031 (1905); *Hughes v. Felton,* 11 Colo. 489, 19 P. 444 (1888).

C. Further, we are not prepared to hold that, even if the votes were taken as proportedly disclosed by the tape recordings, this is not in compliance with Colorado Constitution, Article V, §§22 and 23. In other words, on the basis of the presentation to us, there would appear to be compliance with the two last-mentioned sections of the constitution.

The real problem with the "ayes and noes" requirement is that it is inherently ambiguous. The constitutional section does not specify in exactly what manner the ayes and noes are to be taken — whether by roll call requiring a verbal response, by standing, by a hand signal, by a tally on an electric scoreboard, or by any other specific method. There are un-

doubtedly many ways of taking an ayes and noes vote and no particular one is constitutionally mandated.

If the Colorado Constitution required a particular manner of taking the ayes and noes, then the legislature would be required to strictly comply with that procedure. Just as we hold the Governor to literal compliance with the specific procedures and time limitations for exercise of his veto power, so should we hold the General Assembly to compliance with specific constitutional provisions regulating its procedure. However, when the constitutional requirement can be complied with in a number of ways, our task is to determine whether the method actually chosen is in conformity. The critical inquiry is whether, during final passage, the members of the legislative body were afforded the opportunity to approve or disapprove the pending bill and whether this individual approval or disapproval was recorded in the official journal as mandated by the constitution. Here, the method of voting by the Senate — by use of the "present roll call" and "previous roll call" — in adopting the bills under consideration, afforded the members the opportunity of approval or disapproval.

While we do not necessarily concur, it has been urged, with the citation of a number of cases as authority, that we should hold that the recitals in the journal are conclusive and may not be contradicted or altered in any manner. Under the situation here presented we should show deference to a long standing practice of Senate action in the adoption of bills. We quote the philosophy of this court expressed over 70 years ago in *Board of County Commissioners of Pueblo County v. Strait,* 36 Colo. 137, 85 P. 178 (1906):

" . . . we should show great deference to the legislative construction of the constitution, particularly with reference to its construction of the procedure provided by the constitution for the passage of bills.

. . . .

"We are not without serious doubts as to the correctness of the legislative practice, and we are not prepared to say that unaided by the legislative construction of the articles of the constitution, our construction would have been the same; but it is our duty to resolve the doubt in favor of the validity of the act."

To summarize, the nine bills here involved became law. It should be noted that we do not in any manner pass upon the constitutionality of any of these bills.

MR. JUSTICE ERICKSON concurs in part and dissents in part.

MR. CHIEF JUSTICE PRINGLE and MR. JUSTICE CARRIGAN dissent.

MR. JUSTICE ERICKSON concurring in part and dissenting in part:

I respectfully concur in part and dissent in part.

Colorado, by constitutional fiat, has granted the power to issue advi-

sory opinions to its Supreme Court. *Colo. Const.* Art. VI, sec. 3. *See also* Stevens, *Advisory Opinions — Present Status and Evaluation,* 34 *Wash. L. Rev.* 1 (1959).

The interrogatories submitted by the Governor present important questions concerning the sufficiency of legislative enactments and gubernatorial vetoes. Both parties contend that the other's actions fail to comply with the procedures contained in and required by our constitution. The procedures challenged in this proceeding were not initiated by the present Governor and legislature, but represent accepted practices which have been followed for a number of years and which have not been challenged. This court, consequently, is placed in the position of deciding not only whether certain bills acted upon by the present Governor and legislature were validly enacted and vetoed, but also, whether other statutes enacted over the last 25 years are valid.

The constitutional provisions at issue are clear, unambiguous and mandatory in nature. Article 4, Section 11, of our constitution provides that unless the governor returns a vetoed bill with his objections to the house of origin within ten days, the bill becomes law in the same manner as if he had signed it. If the General Assembly, by their adjournment, prevents the return of a bill within ten days, the governor must file the vetoed bill with his objections in the office of the secretary of state within 30 days after such adjournment or the bill becomes law. Similarly, Article 5, Sections 22 and 23, clearly require that final legislative votes on a bill must "be taken by ayes and noes and the names of those voting be entered on the journal."

Strict interpretation of the constitutional provisions involved in this case requires the conclusion that both the executive and legislative branches of government have failed to comply with the letter of the constitution. The Governor has failed to return several vetoed bills within the time limitations imposed by the constitution and the legislature has not taken all votes on final passage by "ayes and noes." Although they have not complied with the letter of the constitution, both parties seek a determination that their actions substantially complied with the Colorado constitution. In my view, clear and easily understood constitutional provisions must be complied with and lack of strict compliance may not be routinely excused.

The Governor takes the position that the purpose of the timely filing requirements is satisfied by publication of his veto regardless of timely filing. Public notice alone, however, is incapable of satisfying the constitutional mandate. The constitution does not permit the Governor to publicize the fact of his veto and thereafter file the vetoed bill with the house of origin "within ten days or a reasonable time." The constitution is concerned only with timely filing in the prescribed manner. The purpose or purposes intended to be accomplished by filing can be satisfied only by

strict compliance. The correctness of this interpretation is evidenced by the fact that statutory certainty is achieved only if timely filing occurs and interested parties are able to accurately ascertain the status of a given bill. The majority opinion applies a similar interpretation to the meaning of the constitution's veto provisions, and, therefore, I concur in the majority opinion to this limited extent.

Similarly, the Senate contends that the constitutional provisions concerning its voting procedure have been satisfied. Reliance is placed upon legislative journals wherein the names of the legislators and their votes are recorded. The Senate, however, does not dispute the evidence before this court which reveals that the legislators are not called upon individually to verbally respond "aye or no" during the final vote. The practice actually employed involves bill passage upon a vote based upon previous roll calls. Absent members, who previously had been present, are counted as voting affirmatively. While such a procedure may be constitutionally sufficient for first and second legislative readings, the constitution requires that the final passage votes be "taken by ayes and noes." Mere entry of "ayes and noes" in the journals does not suffice where it is clear that an individual "ayes and noes" vote has not been taken.

Strict construction of the constitutional provisions, as set forth above, would cast doubt not only upon the validity of bills presently before the court, but upon numerous bills considered and acted upon by previous governors and legislators. The parties have stipulated that from 1957 to 1976, two preceding governors of this state filed 42 percent of their 30-day, post-adjournment vetoes outside the time limitations contained in our constitution. Similarly, numerous bills which are contained in our statutory compilations were enacted without compliance with the constitutional voting provisions.

It is obvious that retroactive application of a strict constitutional construction, while correct as a matter of law, would create uncertainty, administrative confusion, and would further burden our courts. The functional, purpose-oriented interpretation of the constitution advanced by the parties must also be rejected. First, it would open the door to all branches of government to take a casual, substantial compliance approach to actions mandated by our constitution. Secondly, the court cannot permit the executive and legislative branches to amend constitutional provisions which are clear, unambiguous, and mandatory in nature.

A realistic approach to the issues before this court offers the most reasonable result. Both the executive and legislative branches have acquiesced in the validity of the gubernatorial veto and legislative voting practices. The governor has considered and acted upon bills not enacted according to the letter of the constitution and the legislature has attempted to override gubernatorial vetoes which also failed to comply with the letter of the constitution. Both branches of government in the past

have concerned themselves with the substantive action intended and have not been overly concerned with procedural requirements. Neither can now object to the others' failure to comply with the letter of the constitution.

I would, therefore, hold that past enactments and vetoes, which were carried out in accordance with heretofore non-controverted legislative and gubernatorial practices, are valid, and direct both the Governor and the legislators to comply with the letter of the constitution, as interpreted herein, prospectively, *See Linkletter v. Walker,* 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965); *Great Northern Railway Co. v. Sunburst Oil & Refining Co.,* 287 U.S. 358, 53 S.Ct. 145, 77 L.Ed. 360 (1932).

Prospective application should be afforded to the constitutional principles announced in this case to prevent disruption of what was conceived, and recognized, to be the law, as well as to provide stability to the acts of the executive and legislative branches of government. In my view, only the prospective approach provides a sound constitutional basis for the resolution of this case, while, at the same time, minimizing or eliminating the impairment of the stability of past legislative and executive acts. R. Keeton, *Venturing To Do Justice, Harvard University Press* (1969); R. Traynor, *La Rude Vita, La Dolce Giustiza; or Hard Cases Can Make Good Law,* 29 *U. Chi. L. Rev.* 223 (1962).

MR. CHIEF JUSTICE PRINGLE dissenting:

I respectfully dissent. Since my earliest civics class in grammar school, I have been taught that our system of government consists of checks and balances between a legislative and an executive and judicial branch of government. It is no cliche to say that the people expect in matters of legislation that the Governor elected by all of the people of the state and a majority of a legislature consisting of senators and representatives separately selected by geographic districts agree on legislation before it becomes law. In the event such an agreement does not take place, then two-thirds of the separately selected legislators must agree before a bill can become law. This is the fundamental framework of our government. It is, in my view, the warp and woof of the checks and balances system and no rigid construction of a constitutional provision ought thwart that governmental design.

I am clear in my mind that the revisions in issue here were placed in the Colorado Constitution so that there could be no pocket vetoes and so that the people might know on what basis the Governor acted in exercising his veto power, thus, permitting them to make their judgments as to the correctness of his actions. For me, the holding that the time limits in these provisions are mandatory and are to be so rigidly applied frustrates those purposes. Here the vetoes and the reasons therefor were made public by the Governor before the time limit for filing with the Secretary of State had expired. Then and only a short time after the periods set forth in the constitutional provisions, which I view to be directory rather than rigidly

mandatory, the Governor did file his vetoes and his explanation thereof with the Secretary of State. There could be no possible injury to anyone as a result of the times within which the Governor took his action.

Now, as a result of the majority's construction, bills not agreed to by the Governor and the majority of the Legislature become law. It is my view that when the Governor made public his vetoes with his reasons after adjournment in the case at bar, the purpose of the people in enacting the constitutional provisions was accomplished.

I do not interpret constitutional provisions as did Judge Poffenbarger upon whose opinion in *Capito v. Topping,* 65 W.Va. 587, 64 S.E. 845 (1909), the majority relies. Judge Poffenbarger grounded his opinion on the following philosophy which appears in the quoted cites in the majority opinion:

"[Constitutional provisions] to the extent of their duration, . . . define and limit the policy of the state more *rigidly and unalterably* than the sails and rudder of the ship, when set, govern and control its course." (Emphasis supplied.)

Rather, I would rely on the great constitutionalist, the Chief Justice of the United States, John Marshall, when he said in *McCulloch v. Maryland,* 17 U.S. 579 (4 Wheat. 316),

"[w]e must never forget that it is a *constitution* we are expounding," 17 U.S. at 601 (emphasis supplied).

"This provision is made in a constitution intended to endure for ages to come, and, consequently, to be adapted to the various *crisis* of human affairs." 17 U.S. at 603 (emphasis supplied).

"Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional." 17 U.S. at 605.

I would adopt the doctrine of substantial performance to the Interrogatories propounded here and hold that the will and purpose of the people and the checks and balances system were effected by the vetoes here, and that the bills in questions are not law.

MR. JUSTICE CARRIGAN dissenting:

I respectfully dissent for the reasons which previously compelled me to oppose our becoming involved in this controversy at the time the court agreed to answer the interrogatories propounded by the Governor in this case and by the Senate in No. 28000, *In re Interrogatories of the Colorado Senate of the Fifty-First General Assembly, Senate Resolution No. 5 and S.B. 16.* Because no opinions were published when those threshold decisions were made, and because the public has a right to know why I dissent in cases of such broad public interest, I am writing a single dissenting opinion applicable to both cases. One opinion suffices for

both cases because I would apply the same rule of law to both the Governor and the Senate.

As will be more fully explained below, prior precedents laid down by this court make it crystal clear that the bills here in controversy are not "pending" legislation as the term always has been defined for purposes of the rule limiting advisory opinions to "pending" bills. The gist of my dissent is that since the majority opinion has neither overruled nor distinguished those cases, they should be followed, and for reasons of sound judicial administration policy, we should decline to answer either the Governor or the Senate.

Colorado is one of only a few states in which the supreme court is constitutionally or statutorily authorized to give advisory opinions on questions from the legislature or the executive.[1] *Colo. Const.* Art VI, sec. 3, provides that the court "shall give its opinion upon important questions upon solemn occasions when required by the governor, the senate, or the house of representatives . . . . "

It is for the court, rather than the legislature or the executive, to decide whether the questions are of sufficient public importance and solemnity to justify exercising this extraordinary power. Therefore, each time interrogatories are propounded, the court's initial inquiry must be whether or not it should answer them. *E.g., In re Interrogatories by the Governor,* 126 Colo. 48, 245 P.2d 1173 (1952). In making that preliminary decision, this court must constantly bear in mind that the promulgation of an advisory judicial opinion in response to what amounts to an *ex parte* inquiry from either the executive branch or the legislative branch, concerning the affairs of the other branch, is patently inconsistent with the bed-rock principle of our political system: that power has been separated into three distinct departments. *In re Speakership of the House of Representatives,* 15 Colo. 520, 25 P. 707 (1890). Only in the rarest cases where this court's opinion is demonstrably essential to the public interest should we allow ourselves to be drawn into disputes between the other two equal, coordinate branches of government. Our job is not to participate in the legislative process, but to decide actual cases, nearly always after their

---

[1] *See* Ala. Code tit. 13, §34 (1958); Del. Code Ann. tit. 10, §141 (1975); *Fla. Const.* Art. 4, §1(c); *Me. Const.* Art. VI, §3; *Mass. Const.* pt. 2, ch. 3, art. II; *N.H. Const.* pt. 2, art. 74; *R. I. Const.* amend. 12, §2; *S.D. Const.* Art. V, §5. In eight states — Connecticut, Kentucky, Missouri, Nebraska, New Jersey, New York, Pennsylvania and Vermont — the advisory opinion procedure has been discontinued. Stevens, *Advisory Opinions — Present Status and an Evaluation,* 34 *Wash. L. Rev.* 1 (1959), at 7, n. 32. For a history of advisory opinions in the United States, *See* A. Ellingwood, *Departmental Cooperation in State Government* (1918), at 30-78.

facts have been established by trial on the merits between the real parties in interest.

For the above reasons, even though such an advisory opinion power may be constitutionally authorized, it must be exercised with the utmost vigilance, caution, and self-restraint. *In the Matter of the Constitutionality of Senate Bill No. 65,* 12 Colo. 466, 21 P. 478 (1889). In this instance, by answering the interrogatories, the court departs from restrictions which it has consistently and wisely imposed upon itself in the past to prevent parties from abusing this extraordinary procedure for ulterior motives as well as to avoid being drawn into matters not properly the subjects of advisory opinions. Today's departure from precedent is accomplished without distinguishing, overruling or even mentioning our contrary past cases, thus casting doubt upon the continuing vitality of long-recognized restrictions on the legislative power to invoke this court's opinion regarding validity of legislation.

A firmly rooted prerequisite to exercise of the advisory opinion power, recognized by this court virtually since the adoption of Art. VI, sec. 3, has been that legislative interrogatories, to warrant an answer, must be concerned with "pending" legislation. *In re House Resolution No. 12,* 88 Colo. 569, 298 P. 960 (1931); *In re Interrogatories of the House of Representatives,* 62 Colo. 188, 162 P. 1144 (1916); *In re Senate Resolution No. 4,* 54 Colo. 262, 130 P. 333 (1913); *In re Senate Bill No. 416,* 45 Colo. 394, 101 P. 410 (1909); *In re University Fund,* 18 Colo. 398, 33 P. 415 (1893); *In the Matter of the Constitutionality of Senate Bill No. 65, supra.*

A similar limitation has been established by the courts in nearly every other state with similar advisory opinion provisions. *E.g., Opinion of the Justices,* 294 Ala. 604, 320 So.2d 622 (1975); *Opinion of the Justices,* 355 A.2d 341 (Me. 1976); *Opinion of Justices to the Governor,* 363 Mass. 889, 294 N.E.2d 346 (1973); *Opinion of the Justices,* 115 N.H. 329, 340 A.2d 112 (1975); *Advisory Opinion to Governor,* 110 R.I. 1, 289 A.2d 430 (1972); *Opinion to House of Representatives,* 107 R.I. 77, 264 A.2d 920 (1970).

For these purposes, this court has uniformly considered a bill to be no longer "pending" if the house propounding the interrogatory has already taken a final vote on it. *In re House Resolution No. 12, supra; In re Senate Bill No. 416, supra.* This rule comports with the plain meaning of the word "pending" which has been defined as, "1. not yet decided; 2. being in continuance, in suspense." *Webster's New Collegiate Dictionary* 847 (1976). *Black's Law Dictionary* defines "pending" as: "Begun, but not yet completed; during; before the conclusion of; prior to the completion of; unsettled; undetermined; in process of settlement or adjustment." (Rev. 4th Ed. 1968 at 1291).

This court, applying the plain, ordinary meaning of the word "pending" in the instant context, has previously held:

"Legislative questions must be connected with *pending,* not with *completed,* legislation. *Both bodies of the general assembly have taken a final vote* upon this bill and it no longer can be considered *pending* legislation." *In re Senate Bill No. 416,* 45 Colo. 394 at 395, 101 P. 410 at 410-11 (1909). (Emphasis added.)

I note that both bodies of the general assembly have taken a final vote on every bill whose validity is at issue in these two cases.

Obviously none of the alleged defects in either the Senate's "ayes and noes" voting or the Governor's vetoes had anything to do with S.B. 16, the only bill anyone asserts to be "pending." The majority opinion, with no support in the law of this or any other jurisdiction, has simply stretched the "pending" requirement beyond logic or has overruled it *sub silentio.*

The wisdom of restricting advisory opinions to "pending" bills is readily apparent when one considers the rule's purpose. Once legislation has already been passed, and the normal process by which laws are enacted or vetoed has run its course, private parties may, and should be entitled to, act in reliance on the apparent state of the law inferrable from events publicly known. Rights or duties arise daily pursuant to the actions of citizens based on their reasonable expectations of what the law is. An advisory opinion to the Senate or Governor affecting rights of private parties not granted access to the judicial process by which those rights are affected, and issued long after apparent completion of the legislative process and adjournment of the General Assembly, is highly inappropriate. When, as in this dispute, a long time period has elapsed before anyone has even questioned the validity of a veto or a vote, this reasoning is especially applicable:

"It is a principle declared by our constitution . . ., and of universal recognition, that no person shall be deprived of life, liberty or property without due process of law. But there cannot be due process of law unless the party to be affected has his day in court. Yet a careless construction and application of this constitutional provision might lead to the *ex parte* adjudication of private rights by means of a legislative or executive question, without giving the party interested a day or voice in court." *In the Matter of the Constitutionality of Senate Bill No. 65,* 12 Colo. 466 at 469, 21 P. 478 at 479.

We cannot assume that the attorneys who appeared in this case adequately represented the interests of all those private parties whose rights turn on whether we hold these statutes were validly enacted, or vetoed. Absent today's majority opinion, those parties would have been entitled to their day in court. *See also In re Senate Resolution No. 4, supra; In re Interrogatories of the Senate,* 54 Colo. 166, 129 P. 811 (1913). This court does not and cannot know what actions have been taken by private parties in the many months that have passed since the legislature completed its work on these 1977 bills. Therefore, the court should not purport

to settle those parties' rights in a proceeding in which they cannot be parties and are not represented. "It must be remembered that advisory opinions are not merely advisory opinions. They are ghosts that slay." *F. Frankfurter, A Note on Advisory Opinions*, 37 *Harv. L. Rev.* 1002 (1924).

Adversaries in a real lawsuit have time and incentive fully to investigate the underlying facts, to object to imcompetent evidence, and to put each other's claims to the test of cross-examination. None of these ordinary trial safeguards which distinguish our judicial fact-finding process were observed here. The facts have been either stipulated or assumed by the court, but those not allowed to be parties might have put forth additional evidence not here considered because neither the Senate nor the Governor felt it was relevant to the issues they wished to raise.

Examples based on the bills affected could be set out indefinitely. Even worse is the potential chaos created by the ghosts of bills from bygone years, long believed slain by the veto power, but today resurrected. Surely the court cannot apply one rule to the vetoes of the incumbent governor, but a different rule to those of other governors. What then becomes of the concept of the rule of law? The majority have rejected Mr. Justice Erickson's solution which would have applied these totally new standards prospectively only.

Nor is it an answer that each year's consolidation of the prior year's new enactments into an annual supplement automatically repeals laws not reproduced in the supplement. There remains, even after applying that analysis, the problem of rights and obligations which vested between the effective date of each bill invalidly "vetoed" since 1886, and the date that "law" was repealed by omission from an annual supplement. The point is that the majority's efforts to lay to rest in these two cases the myriad of issues involved in many totally unrelated bills most likely will give rise to more litigation than is settled, as Hercules found when each head he cut off Hydra promptly was replaced by two heads. In more homely terms, we here sow wholesale what we shall have to reap retail.

No major countervailing public interest compels us to forsake the usual orderly processes by which parties directly affected may test the validity of statutes in adversary proceedings. There is no need for this hasty adjudication of many bills without opportunity to litigate the underlying facts whose resolution is essential to proper invocation of the law.

When one considers the purpose of the interrogatory procedure, it is obvious that this court's response to a legislative interrogatory, regarding validity of a bill no longer awaiting action by that body, amounts to nothing more than a gratuitous opinion, because no further legislative action on *that bill* depends on the court's advice. The major purpose of Art. VI, sec. 3, is to enable the legislature to obtain this court's advice as to the validity of *proposed* laws, and thereby prevent enacting unconstitutional legislation. *In re Senate Resolution No. 4, supra.* An advisory opinion

on the bills here at issue, which have already left the legislature following its final action, certainly does not serve that purpose. Therefore the court not only risks adjudicating private rights not argued or considered, but it does so with no compelling reason.

Moreover, although this court has not in the past applied to the governor the requirement that interrogatories relate to "pending" legislation, the policy and rationale of that rule apply equally to the governor in this particular case. The bills at issue here have been finally acted upon by the governor, and no further action of his depends on our advice. For that reason, there is no need for this court to risk deciding the rights of private parties not here represented. *Opinion of the Justices,* 294 Ala. 604, 320 So.2d 622 (1975); *Opinion of the Justices to the Governor,* 363 Mass. 889, 294 N.E.2d 346 (1973); *Opinion of the Justices,* 115 N.H. 329, 340 A.2d 112 (1975); *Advisory Opinion to the Governor,* 110 R.I. 1, 289 A.2d 430 (1972).

In an attempt to avoid the long settled precedents limiting this court's advisory opinions to legislation still "pending," the Senate's interrogatories direct the court's attention to S.B. 16, which was introduced, not at the 1977 session which gave birth to the bills whose validity is here questioned, but on January 4, 1978, in the following year's session. Of all the bills mentioned in the majority opinion, only S.B. 16 awaits any further action by the Senate. But there is no claim asserted that S.B. 16 is invalid or unconstitutional and, of course, no attempt to veto it is here in issue.

The purpose of S.B. 16 is to authorize the 1977 supplement to the 1973 Colorado Revised Statutes, and to reenact the statutes set forth in the supplement. Because of the substantial questions regarding the validity of the Governor's vetoes of 1977 acts, it is argued, there is uncertainty as to which laws enacted in 1977 should be printed in the annual supplement, and it is said that the supplement cannot properly be formulated without guidance from this court. Thus, the argument concludes, legislative action is still pending on these bills, and the court should address their validity.

This contention, however, merely seeks to divert the court's attention from the bills whose validity is really questioned, and ignores the purpose of the "pending" requirement. Even assuming, for the sake of argument, that a decision by the General Assembly not to publish the contested bills in the supplement would effectively repeal them,[2] that implied repeal could not operate to extinguish any rights or liabilities which might already have attached during the bills' effective periods. *See* sections 2-5-113(2)(c) and 2-5-117(3), C.R.S. 1973.

Therefore, regardless of the "uncertainty" surrounding publication of the supplement, any advice this court gives concerning these contested

---

[2] *See* sections 2-5-113 and 2-5-117, C.R.S. 1973.

bills still runs the danger of adjudicating the rights of private parties who have had no notice or opportunity to be heard in these proceedings. Since it is the validity of those 1977 bills, and not S.B. 16, that is at issue, the fact that S.B. 16 is "pending" is irrelevant.

Any decision the Senate might now make to publish or not to publish in the annual supplement the 1977 bills, cannot affect the validity of their initial enactment or any purported veto. Nor have we been given any valid reason why, if the General Assembly wishes to publish bills the governor has vetoed, and thus obviate any claim that they were repealed by non-publication, the established procedure employed in the session laws cannot be followed; *i.e.,* each such "law" could be published along with a caveat setting out the facts regarding the contested veto, leaving for those whose rights are affected the choice of whether or not to litigate. Surely the mere difference in printing time or expense is not sufficient cause to justify the turmoil the majority opinion wreaks.

Finally, weighty considerations of sound judicial administration, in my view, mandate this court's non-participation. Justice Frankfurter's language in *Colegrove v. Green,* 328 U.S. 549, 66 S.Ct. 1198, 90 L.Ed. 1432 (1946), is especially applicable here:

"Nothing is clearer than that this controversy concerns matters that bring courts into immediate and active relations with party contests. From the determination of such issues this Court has traditionally held aloof. It is hostile to a democratic system to involve the judiciary in the politics of the people. And it is not less pernicious if such judicial intervention in an essentially political contest be dressed up in the abstract phrases of the law." 328 U.S. at 553-54, 66 S.Ct. at 1200, 90 L.Ed. at 1434.

The same sentiment was reiterated in Justice Frankfurter's dissent in *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1961), where he wrote:

"The Court's authority — possessed of neither the purse nor the sword — ultimately rests on sustained public confidence in its moral sanction. Such feeling must be nourished by the Court's complete detachment, in fact *and in appearance,* from political entanglements and by abstention from injecting itself into the clash of political forces in political settlements," 369 U.S. at 267, 82 S.Ct. at 737-38, 7 L.Ed.2d at 714-15[3] (Emphasis added.)

In my view we should follow the well-established precedents above discussed and decline to decide the issues here raised unless and until they are litigated in the usual manner assuring due process of law to the persons most directly affected.

---

[3] This case does not necessarily involve "political questions" as that term has been defined by the United States Supreme Court. *See Hart & Wechsler, The Federal Courts and the Federal System* 214-241 (2d Ed. 1973). However, the format in which the questions are posed is, or has the potential of being, highly political, and the need for caution in becoming involved cannot be over-emphasized.