The parties, the underlying lawsuits, and the trial court's judgment
On July 29, 1991, the last day of the 1991 Alabama regular legislative session, before the legislature's adjournmentsine die (final adjournment of the session), the legislature passed the 1991 educational appropriations bill, House Bill 203. On August 8, 1991, the Governor of Alabama, Guy Hunt, attempted to approve portions of that bill and to disapprove other portions of it.
Three actions were filed challenging the Governor's attempted disapproval of portions of House Bill 203. Each action sought a judgment declaring that the Governor's attempted disapproval of portions of House Bill 203 was unconstitutional and requested that the Governor; G. Robin Swift, the State Finance Director; and Robert L. Childree, the State Comptroller, be enjoined from acting in a manner inconsistent with House Bill 203 as enacted by the legislature.[1] David Bronner and Paul Hubbert, individually and in their capacities as members of the Public Education Employees Health Insurance Board, filed one action; Wayne Teague individually and in his capacity as state superintendent of education, filed another action; and James E. Folsom, Jr., lieutenant governor of Alabama, and numerous state senators and representatives filed the third action. All three actions were consolidated for trial. For the sake of simplicity, we refer to all the arguments made by all the plaintiffs as Teague's arguments, and we refer to all the arguments made by all the defendants as the Governor's arguments.
On September 9, 1991, shortly after these actions were filed in the circuit court, the Alabama Senate requested this Court's opinion on the same issues as were raised in these actions. Pursuant to our long-settled policy of declining to issue advisory opinions on questions pending in litigation, seeOpinion of the Justices No. 306, 447 So.2d 1305 (Ala. 1984);Opinion of the Justices No. 298, 431 So.2d 496 (Ala. 1982); *Page 850 Opinion of the Justices No. 289, 410 So.2d 388 (Ala. 1982); andOpinion of the Justices No. 214, 294 Ala. 589, 319 So.2d 715
(1975), we did not immediately address the advisory opinion request, preferring to wait and address the questions in a full adversary proceeding. In light of the importance of the issues presented, these cases presenting those issues were expedited on appeal so that we could quickly answer the questions presented by them. With the issuance of this opinion, the Senate's request is moot. See Opinion of the Justices No. 332,588 So.2d 864 (Ala. 1991).
The parties argued to the trial court that §§ 125 and 126 of the 1901 Alabama Constitution and those sections' interpretation were dispositive of the issues presented by the three consolidated actions. The trial court entered an order that stated pertinently:
 "Having carefully reviewed and considered the language of Sections 125 and 126 of the Alabama Constitution of 1901, this Court finds that the Governor does not constitutionally possess the power under § 126, or under any other section of the Constitution, read in pari materia, to disapprove a distinct item, or distinct items, in an appropriation bill embracing distinct items after adjournment sine die of the Alabama legislature.
". . . .
 "On the basis of the foregoing, this Court finds and DECLARES that the actions taken by the Governor in disapproving certain portions of House Bill 203. . . . were ineffectual to constitute an item veto under § 126 and are thus a nullity. Because the Governor, pursuant to Sections 125 and 126, signed House Bill 203 and because the Governor intended that House Bill 203 be approved in its entirety in the event his attempted exercise of an item veto was unconstitutional, I further hold and DECLARE that House Bill 203 is valid in its entirety and entitled to enforcement as passed by the legislature.
"Therefore, it is hereby
 "ORDERED, ADJUDGED AND DECREED that the Defendants, and all those acting in concert with them, be, and the same hereby are, enjoined and restrained from acting inconsistently with this Order and from failing to enforce, and make payments in accordance with House Bill 203. . . ."
 Factual Background
The parties have stipulated all the facts necessary to decide this case. The legislature passed House Bill 203 on July 29, 1991, and it adjourned sine die that same day. On August 8, 1991, the Governor attempted to approve a portion of House Bill 203 and to disapprove a portion of it by marking through certain provisions in red ink and initialing those marked-out provisions. The Governor signed the end of House Bill 203 with the following language:
 "Approved as to all items except those specifically disapproved and stricken out in red ink; where applicable, funds totals throughout this bill have been adjusted in the same manner to reflect the items so disapproved.
"Date: 8-8-91
"Time: 7:20 P.M.
 /s/ Guy Hunt ------------ "GOVERNOR"
Also, on August 8, the Governor sent a letter to the clerk of the House of Representatives and to the secretary of state detailing the portions of House Bill 203 that he had disapproved.
Finally, the parties stipulated:
 "Had the Governor not believed that he had the power under Section 126 of the Alabama Constitution to disapprove only a part or parts of House Bill 203 to eliminate the portions of the Bill he believed to be detrimental to the best interests of the State of Alabama, he would have approved and signed the Bill as presented to him without striking out any portions thereof and without the [language above his signature expressing his disapproval.] Accordingly, if, as a matter of law the Governor did not have the constitutional power to disapprove *Page 851 
only certain portions of House Bill 203, the Governor's signature at the foot of the Bill indicates his approval of the entire Bill."
 The issues presented
The Governor's power to veto legislation comes from §§ 125 and 126 of the 1901 Alabama Constitution. A clear understanding of the issues presented in this case requires an understanding of the formal procedural interaction between the executive and the legislative branches in relation to the legislature's passing legislation and the Governor's approving or disapproving it.
Section 125 provides pertinently:
 "Every bill which shall have passed both houses of the legislature, except as otherwise provided in this Constitution, shall be presented to the governor; if he approve, he shall sign it; but if not, he shall return it with his objections to the house in which it originated, which shall enter the objections at large upon the journal and proceed to reconsider it. If the governor's message proposes no amendment which would remove his objections to the bill, the house in which the bill originated may proceed to reconsider it, and if a majority of the whole number elected to that house vote for the passage of the bill, it shall be sent to the other house, which shall in like manner reconsider, and if a majority of the whole number elected to that house vote for the passage of the bill, the same shall become a law, notwithstanding the governor's veto. If the governor's message proposes amendment, which would remove his objections, the house to which it is sent may so amend the bill and send it with the governor's message to the other house, which may adopt, but can not amend, said amendment; and both houses concurring in the amendment, the bill shall again be sent to the governor and acted on by him as other bills. If the house to which the bill is returned refuses to make such amendment, it shall proceed to reconsider it; and if a majority of the whole number elected to that house shall vote for the passage of the bill, it shall be sent with the objections to the other house, by which it shall likewise be reconsidered, and if approved by a majority of the whole number elected to that house, it shall become a law. If the house to which the bill is returned makes the amendment, and the other house declines to pass the same, that house shall proceed to reconsider it, as though the bill had originated therein, and such proceedings shall be taken thereon as above provided. In every such case the vote of both houses shall be determined by yeas and nays, and the names of the members voting for or against the bill shall be entered upon the journals of each house, respectively. If any bill shall not be returned by the governor within six days, Sunday excepted, after it shall have been presented, the same shall become a law in like manner as if he had signed it, unless the legislature, by its adjournment, prevent the return, in which case it shall not be a law; but when return is prevented by recess, such bill must be returned to the house in which it originated within two days after the reassembling, otherwise it shall become a law, but bills presented to the governor within five days before the final adjournment of the legislature may be approved by the governor at any time within ten days after such adjournment, and if approved and deposited with the secretary of state within that time shall become law. Every vote, order, or resolution to which concurrence of both houses may be necessary, except on questions of adjournment and the bringing on of elections by the two houses, and amending this Constitution, shall be presented to the governor; and, before the same shall take effect, be approved by him; or, being disapproved, shall be repassed by both houses according to the rules and limitations prescribed in the case of a bill."
(Emphasis added.)
Section 125 on its face thus establishes that as a final stage of the enactment of a bill into law, the Governor may either sign a bill or allow it to become law without his *Page 852 
signature by not returning it to the legislature within six days of its presentation to him. When the legislature is in session, the Governor may disapprove, or veto, a bill by returning it, along with his objections, to the house of its origination within six calendar days (excluding Sundays) of the bill's presentation to him. When the legislature is in session, the Governor may also propose executive amendments to bills presented to him; those amendments become law only if the legislature adopts them, of course.
Section 125 further provides a somewhat different procedure to be followed in the five days prior to final adjournment. A bill presented to the Governor in the five days before the legislature's final adjournment may be approved by the Governor, who may take as long as 10 days after the legislature's final adjournment to approve the bill. A bill presented to the Governor in the last five days before the legislature's final adjournment may still be returned by the Governor to the legislature with the Governor's objections or amendments — presumably this includes a § 126 item disapproval from an appropriations bill — and the bill as modified by the Governor becomes law if the legislature passes it before the legislature's final adjournment. If the Governor does not approve a bill that is presented to him in the five days before the legislature's final adjournment, the bill dies, because of these combined factors: for a bill to become a law, (1) the Governor must approve it or, (2) if the Governor disapproves it, it must be repassed by the legislature, thus overriding the Governor's veto, or (3) the bill may become law by the passage of time — six days — if the Governor neither approves nor disapproves it; if a bill is presented in the last five days, it cannot become law by passage of six days without the Governor's acting on it; the legislature cannot act on the bill, of course, after its final adjournment. As to bills presented within the last five days before final adjournment that the Governor has not acted upon at final adjournment, the Governor may either approve them or allow them to die.
When the Governor does not approve a bill and thus allows it to die, as described above, the Governor is said to have exercised a "pocket veto." Note that the Governor does not accomplish a pocket veto by taking any affirmative action — returning the bill to the legislature with his objections or amendments, for example — but, rather, the Governor accomplishes a pocket veto by inaction, by not affirmativelyapproving the bill.
Consider the facts of this case. The Governor did not pocketveto the contested portions of House Bill 203. Quite the opposite, he affirmatively acted by striking those provisions that he considered inappropriate. Also of note, the Governor's actions occurred after the legislature had adjourned sine die.
The Governor did not simply approve or disapprove the entire bill, as § 126, on its face, authorizes him to do, but, instead, disapproved specific items of House Bill 203. Accordingly, the action the Governor took can be accurately described as a post-adjournment item veto.
Section 126 provides:
 "The governor shall have power to approve or disapprove any item or items of any appropriation bill embracing distinct items, and the part or the parts of the bill approved shall be the law, and the item or items disapproved shall be void, unless repassed according to the rules and limitations prescribed for the passage of bills over the executive veto; and he shall in writing state specifically the item or items he disapproves, setting the same out in full in his message; but in such case the enrolled bill shall not be returned with the governor's objection."[2]
Section 126 provides for item vetoes in appropriation bills, such as House Bill 203, but that section does not explicitly address item vetoes after the legislature's adjournmentsine die. *Page 853 
Considering our discussion so far, we find the dispositive issue in these appeals to be:
 Whether § 125 or § 126, either by itself or in relation to each other, authorizes the Governor to item-veto a bill after the legislature has adjourned sine die?
This is an issue of first impression.
 Section 125 and the post-adjournment item veto
The Governor makes his argument in relation to § 125 primarily in two ways. First, he contends that Courts in other states construing provisions similar to § 125 (and § 126) have allowed the governor a post-adjournment item veto. Those cases from other states, some of which do not directly address the issue as stated here, construe constitutional provisions materially different from §§ 125 and 126. The constitutions of Arkansas, North Dakota, Wyoming, Washington, Florida, Idaho, and Colorado, from which states the Governor has cited cases, all have veto provisions materially different from those of the Alabama Constitution. Those states require an active
post-adjournment veto; that is, where the adjournment of the legislature prevents a bill's return, the bill nonetheless becomes law unless the Governor affirmatively vetoes it by filing objections with the secretary of state. They require no message to the legislature and contemplate no further legislative action. See, Dickinson v. Page, 120 Ark. 377,179 S.W. 1004 (1915); State ex rel. Sandaker v. Olson, 65 N.D. 561,260 N.W. 586 (1935); State ex rel. Jamison v. Forsyth, 21 Wyo. 359,133 P. 521 (1913); State ex rel. Greive v. Martin,63 Wn.2d 126, 385 P.2d 846 (1963); Green v. Rawls, 122 So.2d 10
(Fla. 1960); Wheeler v. Gallet, 43 Idaho 175, 249 P. 1067
(1926); In re Interrogatories of the Governor, 195 Colo. 198,578 P.2d 200 (1978). The Court in State ex rel. Martin v.Zimmerman, 233 Wis. 442, 289 N.W. 662 (1940), expressly notes that the Wisconsin constitutional provision regarding the partial veto is not comparable to provisions similar to that of Alabama.
Equally damaging to the persuasive value of the majority of the cases cited by the Governor is the fact that they involve issues different from that presented here. That is true of the decisions from New Mexico, Arkansas, Washington, Florida, Idaho, Montana, and Colorado. State ex rel. Dickson v. Saiz,62 N.M. 227, 308 P.2d 205 (1957); Dickinson v. Page, 120 Ark. 877,179 S.W. 1004 (1915); Green v. Rawls, 122 So.2d 10 (Fla. 1960);Cenarrusa v. Andrus, 99 Idaho 404, 582 P.2d 1082 (1978);Wheeler v. Gallet, 43 Idaho 175, 249 P. 1067 (1926); The VetoCase: Mills v. Porter, 69 Mont. 325, 222 P. 428 (1924); In reInterrogatories, 195 Colo. 198, 578 P.2d 200 (1978). The central issue in those cases was not the power of the governor to exercise a post-adjournment item veto; rather, these cases involved such issues as whether the "item" sought to be vetoed by the governor was in fact an "item"; Green; Cenarrusa,Wheeler; whether the item veto power gave the governor the authority to reduce an item of appropriation, The Veto Case;
whether the governor had timely exercised the veto power,Dickinson, Cenarrusa, In re Interrogatories; or whether the item veto power was limited to general appropriations bills, as opposed to any bill containing appropriations. Dickinson.
The Governor also argues that a proper analysis of § 125 begins with a historical review of the provision as it was enacted into the 1901 Constitution and, he argues, leads to the conclusion that he has the authority to exercise a post-adjournment item veto. We agree that a proper analysis of § 125 begins with a historical review of the provision.
Section 125 of the 1901 Constitution is based on Art. V, § 13, of the 1875 Alabama Constitution, which provided:
 "Sec. 13. Every bill which shall have passed both houses of the general assembly, shall be presented to the governor; if he approve, he shall sign it; but, if not, he shall return it with his objections to that house in which it shall have originated, who shall enter the objections at large upon the journals; and the house to which such bill shall be returned shall proceed to reconsider it; if, after such *Page 854 
reconsideration, a majority of the whole number elected to that house shall vote for the passage of such bill, it shall be sent, with the objections, to the other house, by which it shall likewise be reconsidered; if approved by a majority of the whole number elected to that house, it shall become a law; but in such case the votes of both houses shall be determined by yeas and nays; and the names of the members voting for or against the bill shall be entered upon the journals of each house respectively. If any bill shall not be returned by the governor within five days (Sundays excepted), after it shall have been presented to him, the same shall be a law, in like manner as if he had signed it, unless the general assembly, by their adjournment, prevent its return, in which case it shall not be a law. And every vote, order, or resolution, to which the concurrence of both houses may be necessary (except questions of adjournment, and of bringing on elections by the two houses, and of amending this Constitution), shall be presented to the governor, and, before the same shall take effect, be approved by him, or, being disapproved, shall be repassed by both houses according to the rules and limitations prescribed in the case of a bill."
A comparison of Art. V, § 13, to § 125 reveals that § 125 contains these modifications from its predecessor:
 1. Section 125 authorizes the Governor to return a bill to the legislature with an executive amendment.
 2. Section 125 extends from five to six days the time before a bill becomes law if not returned by the Governor after it is presented to the Governor.
 3. Section 125 allows the Governor to approve bills presented to him within 5 days before final adjournment at any time within 10 days after final adjournment.
The proceedings of constitutional conventions are valuable in determining the meaning and purpose of constitutional provisions. City of Montgomery v. Graham, 255 Ala. 685,53 So.2d 363 (1951). Accordingly, we look first to the proceedings of the 1901 Constitutional Convention for aid in interpreting § 125.
A review of the debate on allowing executive amendments indicates that the drafters did not intend for § 125 to authorize the Governor to make post-adjournment executive amendments. Official Proceedings, Constitutional Convention of1901, Vol. 1, pp. 618-82. There are at least two specific bases for that conclusion. First, the drafters meant, at least as regards § 125, that if a bill is passed within the last five days before the legislature's final adjournment, it dies unless the Governor approves it:
 "MR. WILSON (Clarke [County]) — I would like to ask the gentleman a question. If a bill is passed by both houses of the General Assembly and sent to the Governor less than five days before the final adjournment, if the Governor simply withholds his approval, what becomes of the bill — if he neither approves nor disapproves?
 "MR. JONES (Montgomery [County]) [chairman of the convention's committee on the executive branch] — It is dead."
Official Proceedings, Vol. 1, p. 623. That there can be no post-adjournment executive amendment would seem to be necessarily true as a practical matter: the legislature must approve an amendment for it to become law and if the legislature is adjourned it obviously cannot approve an amendment. In addition to these considerations, the tone of the discussions concerning granting the Governor the power to make an executive amendment does not indicate any intent to extend to the Governor any power to make an executive amendment that is not apparent from the face of the provision:
 "MR. LOWE (Jefferson [County]) — . . . . It seems to me that the proposition [to allow executive amendments] embraced in the report of the committee is the most radical and the most far-reaching that has yet come before this Convention. The proposition embraces the idea and carries with it the theory that the Governor may move amendments to bills pending before the General Assembly. *Page 855 
 It strikes down the line of demarkation which has existed from the beginning between the different and co-ordinate departments of government. For that reason, Mr. President, I shall oppose the provision in the report of the committee.
 "Why should he at this late day, at this period in the history of our State and of our country, suggest for the first time that the Executive Officer should, for the purpose of amending bills, become a member of the General Assembly? Why sir, the executive functions and those of the law-making body are entirely distinct, they are co-ordinate but inconsistent. The Governor if he fails to approve the action of the General Assembly can put upon it the stamp of his disapproval, and then the law-making power, the ordinary and direct representatives of the people have the right to say whether the veto of the Governor shall stand. But now this insidious innovation proposes that the Governor to all intents and purposes may not only exercise the executive function, but that he may go upon the floor of the House of the Representatives of the people and insist upon amendments to their bill. Now sir, it is possible that we shall never have an ambitious and intriguing Governor, but suppose we do, and suppose he wants not merely to pass upon the laws the people's representatives have enacted, but wishes to shape, suggest and frame those laws, he could easily make his terms and conditions and say you must accept this amendment or your bill will fail. I oppose it because the proposition seeks to remove the ancient landmarks, because it seeks to break down the wall that stands between the legislative and the executive."
Official Proceedings, Vol. 1, pp. 629-30.
Note that the power to offer an executive amendment is a power to take an affirmative action in disapproving legislation, and that the power to offer a post-adjournment executive amendment would be a power to take an affirmativeaction in disapproving legislation after final adjournment. As we discussed, § 125 does not authorize a post-adjournment executive amendment, and the provisions of § 125 concerning executive amendments thus cannot be construed to indicate that the Governor is authorized after adjournment to take the affirmative actions involved in a post-adjournment item veto.
Section 125 also varies from its predecessor by allowing the Governor 10 days after final adjournment to approve bills presented in the last 5 days before final adjournment. The purpose of that extension of time for the Governor to approve bills was described by the chairman of the Convention's committee on the executive department:
 "MR. JONES (Montgomery [County]). . . . [U]nder the present Constitution the General Assembly is helpless after the fifth day as to any bill they may send to the Governor. After the commencement of the five days every bill that goes there can be pocketed by the Governor if he wants to do it, so that in that respect we have not put the General Assembly in any more helpless condition than under the [1875] Constitution; but it is known to my friend from Chambers and to all of us that towards the heel of the session a Governor is so crowded with bills that he cannot read them. I do not think there has been a man in office in at least twenty years who has read one-half of the bills which he has signed towards the close of the session. It is absolutely a physical impossibility. He has to rely on the Attorney General and some trusted friends and they read in a hurry to avoid 12 o'clock at night on the last night and he is acting in the dark. The object of this provision is to give the Governor, in whom the people trust, an opportunity to calmly consider the mass of the bills that is always piled on his table the night the General Assembly adjourns."
Official Proceedings, Vol. 1, p. 620.
The following quote is representative of the discussion of the bill by delegates to the Convention:
 "MR. COBB. . . . The Governor of the State of Alabama, is, in a very important *Page 856 
sense, a part of its legislative department. In the Constitution, we provide before any act in the nature of legislation shall become a law, it shall have the approval and assent of the Governor. The supposition and intention is that the acts of the General Assembly shall be carefully scrutinized by the Chief Executive in order to prevent hasty and improvident legislation. Now, any provision which increases his power in this regard and gives him a better opportunity so to scrutinize the actions of the General Assembly is a wide departure from heretofore existing precedents. But I have no respect for precedents merely as such. If we can find a better way we should pursue it, and not hamper ourselves and tie ourselves to the old way just because it is the old way. The gentleman from Montgomery, my distinguished friend, Governor Oates, has been unable, as has every other gentleman on this floor, and as they will be unable, to point out one single solitary objection to the proposition made here by the report of the committee. And this, for the reason that where bills go to him within a certain time of the adjournment, he can easily prevent these bills from becoming laws, by simply refusing his assent. The Legislature adjourns and the laws are not enacted. He may often times find himself in this situation. Here is a bill about which he has doubt. It is an important matter. He is willing to trust the Attorney-General or any other friend, but he wants to pass his own cool and deliberate judgment upon it. He has not the time to do it, and, therefore, out of abundant caution, he refuses to let it become a law at all. Give him this ten days and he will have this opportunity to deliberate, to consider, and to examine and thus avoid the difficulty of refusing to permit a good measure to become a law by reason of the lack of opportunity afforded him to examine it. What is the harm, I repeat, and as has been repeated heretofore? If he approves the bill, it is a law; if he refuses to approve it, it is not a law. What harm is it to give him a little time to say whether he will approve it? His approval of it before the adjournment of the Legislature can have no possible effect different from his approval of it ten days after the adjournment. . . ."
Official Proceedings, Vol. 1, pp. 623-24.
(Emphasis added.)
Accordingly, the provision in § 125 allowing the Governor 10 days after adjournment to approve legislation passed in the 5 days prior to final adjournment allowed a practical remedy to the situation created when a large number of bills passed the legislature on the last day of the session. As Mr. Cobb indicated, the delegates to the convention were acutely aware that under the 1875 Constitution legislation died if not approved by the Governor prior to final adjournment. The 10-day period provided the Governor the time to read and review the bills, and then, with approval of a bill, to allow it to become law.
From this discussion it should be clear that the provision of § 125 allowing the governor to approve a bill up to 10 days after final adjournment did not alter or increase the actions
that the Governor could take in relation to bills passed in the last 5 days days prior to the legislature's final adjournment. Indeed, the provision gives the Governor the same two options the Governor previously had, to approve the bill or let it die; the provision simply allows the Governor more time — 10 days — in which to exercise these options.
Allowing the Governor time after adjournment to decide whether to approve a bill or let it die does not provide the Governor a post-adjournment item veto. Section 125 does not even allude to a veto of items within a bill. Furthermore, the only post-adjournment "veto" created by § 125 is the "pocket veto" — a veto of an entire bill achieved by the Governor'sdoing nothing to that bill. The only power that § 125 provides the Governor after the legislature's final adjournment is to approve bills presented to him within five days of the legislature's final adjournment. Quite simply, after the final adjournment of the legislature, § 125 does not provide the Governor an affirmative power to disapprove *Page 857 
a bill or items of a bill. Accordingly, the Governor's arguments that § 125 provides him authority for a post-adjournment item veto fail.
 Section 126 and the post-adjournment item vetoes
Section 126 is based on Art. V, § 14, of the 1875 Alabama Constitution, which provided:
 "The governor shall have power to disapprove of any item or items of any bill making appropriations of money, embracing distinct items; and the part or parts of the bill approved shall be the law, and the item or items disapproved shall be void, unless repassed according to the rules and limitations prescribed for the passage of other bills over the executive veto; and he shall, in writing, state specifically the item or items he disapproves."
Comparing § 14 to § 126 reveals at least three primary differences:
 1. Section 126 contains the word "approve" in the first clause.
 2. Section 126 requires that the Governor "in his message" fully set out in writing specific reasons for disapproving certain items.
 3. Section 126 states that "the enrolled bill shall not be returned with the Governor's objection."
Section 126 does not expressly address whether its item-veto provisions apply after the legislature's adjournment sine die.
There is virtually no pertinent discussion concerning this issue recorded in the proceedings of the Constitutional Convention.[3] Accordingly, our analysis of § 126 is based on the text of the provision and the relationship of that provision to § 125.
The Governor argues that when § 126 is read in pari materia
with § 125, the sections provide that he is entitled to approve or disapprove items within appropriation bills at any time during the 10 days following the legislature's sine die
adjournment. The Governor contends that because the Constitutional Convention added the word "approve" to Art. V, § 14, when drafting § 126, and the same Convention, when drafting § 125, added to Art. V, § 13, the provision allowing approval
of bills during the 10 days following the legislature's final adjournment, the intended effect of those two modifications of the 1875 Constitution for the 1901 Constitution was to allow the Governor to either approve or disapprove items within appropriation bills at any time within 10 days after the legislature's final adjournment.
The Governor also states that according to the plaintiffs, § 125 limits him to approving bills after final adjournment; he contends, however, that § 126 contains no language limiting his actions after adjournment. To the contrary, he argues, § 126 expressly allows him to approve or disapprove items in an appropriation bill without regard to final adjournment, as long as he acts within 10 days of final adjournment. If the drafters of the Constitution had intended the supposedly restrictive language of § 125 to apply to § 126, they would have included it in that section, the Governor contends.
Finally, the Governor argues that if the item veto does not survive adjournment, *Page 858 
§ 126 is redundant in relation to § 125, because § 125 allows for an executive amendment that serves the same purpose as an item veto.
Except for the Governor's final argument, all his contentions are arguably meritorious. The argument that § 126 is redundant if the item veto does not survive final adjournment is meritless, because it fails to acknowledge the difference between an executive amendment and an item veto. When an executive amendment is proposed, that amendment must be approved by the legislature to become law. Presumably, if the item veto is exercised prior to final adjournment, the items approved become law, while the items vetoed are treated in accordance with the provisions of § 125 concerning after-veto procedures. Section 126 is not redundant in relation to § 125, regardless of whether the item veto of § 126 can be used by the Governor after the legislature's final adjournment.
Teague contends that the Governor's arguments effectively ignore the provisions of § 126 that do not expressly favor the Governor's position. Teague argues that § 126, given below, read in its entirety, refers to an item veto in terms of a procedure that can be accomplished only when the legislature is not adjourned sine die:
 "The governor shall have power to approve or disapprove any item or items of any appropriation bill embracing distinct items, and the part or the parts of the bill approved shall be the law, and the item or items disapproved shall be void, unless repassed according to the rules and limitations prescribed for the passage of bills over the executive veto; and he shall in writing state specifically the item or items he disapproves, setting the same out in full in his message, but in such case the enrolled bill shall not be returned with the governor's objection."
(Emphasis added.)
As we mentioned earlier, § 126 differs from its predecessor provision in the 1875 Constitution in that it contains the requirement that the Governor set out "in his message" the items he disapproved. Teague argues that because § 126 requires the Governor to state "in his message" specifically and in writing the items he disapproves, the item veto provisions of § 126 can be invoked only with a Governor's message to the legislature stating specifically the items that the Governor disapproves. Teague further contends that the term "message" is a term of art and refers to the only way the Governor can make substantive communications to the legislature or, for that matter, the only way the houses of the legislature can communicate between themselves; in neither situation, Teague argues, can there by a "message" if the legislature (or the other house of the legislature) is not in session. The House and Senate Journals seem to indicate that the practice involving messages is as Teague describes it. Teague contends that these arguments thus lead to the conclusion that § 126 does not authorize a post-adjournment item veto, because, if the legislature is adjourned, the Governor cannot proffer to the legislature the very message that § 126 requires. In support of that argument, and to indicate that the Governor's writing to the clerk of the House of Representatives and to the secretary of state is not a "message" within the meaning of § 126, Teague cites State ex rel. Crenshaw v. Joseph, 175 Ala. 579,586, 57 So. 942, 944 (1911), wherein a plurality of the Court stated:
 " 'A message from the executive to either branch of the Legislature, delivered to an officer of the body, who may not even be a member, and when it is not in session, for transmission and delivery to "the House" when it shall reconvene, is an anomaly in parliamentary law. Messages from the executive to either branch of the General Assembly are invariably delivered to the House while in session, and not to the officers for them. Such has been the immemorial usage, and the same custom obtains concerning messages from one house to the other. There is neither parliamentary nor statute law which confers any functions upon the secretary or clerk of either house, while they are in recess, concerning *Page 859 
the reception of messages from the other house or from the executive. Parliamentary law absolutely divorces clerks and secretaries from such functions, and is so exacting in this regard that one house will not receive a message from the other if the house sending the message is not in session. Indeed, it would seem that the express language of the Constitution, which requires the return "to the House," would repeal any parliamentary or statute law or custom, if such had obtained, whereby the return might be made to the clerk or secretary of the House, while it was not in session, for delivery to it when it reconvenes.' "
Teague also contends that the provision in the last clause of § 126, that the bill not be "returned" with the Governor's"objection," indicates that § 126 authorizes the Governor to veto items of a bill only before the legislature's final adjournment, because, he argues, unless the legislature is in session to act on the returned vetoed items and the Governor's objections to them, there is no reason for the Constitution to require the Governor to return his objections; returning the vetoed items with objections to an adjourned legislature would indeed be futile and is contradictory to the procedure for a pocket veto inherent in § 125, Teague contends.
Finally, Teague contends that § 126 provides that its item veto is to be used in accordance with the provisions of § 125 for action upon a bill after a veto; he bases that argument on the language of § 126 stating that "the item or items disapproved shall be void, unless repassed according to the rules and limitations prescribed for the passage of bills over the executive veto." Teague argues, as we have held, that § 125 provides no post-adjournment item veto, no authority for an affirmative action of disapproval after final adjournment, and he argues that the phrase quoted immediately above refers to a situation where the affirmative action of the Governor (in an item veto) is valid only if reconsidered and not overridden by the legislature in accordance with § 125. Accordingly, Teague concludes, § 126 does not authorize post-adjournment item vetoes, because, after the legislature has adjourned, it cannot consider the Governor's item veto pursuant to § 125.
We find Teague's arguments more convincing than the Governor's, because Teague's arguments involve a less strained interpretation of both the text of § 126 and its relationship to § 125 and because Teague's arguments address § 126 in its entirety, not just isolated portions of it. The plain language of § 126 contemplates that upon the legislature's receipt of the Governor's message disapproving an item or items of a bill and expressing his objections thereto, those items may be repassed by the legislature according to the rules prescribed in § 125 for the passage of bills over the Governor's veto. As this opinion has indicated, however, unless the legislature isin session, the legislature may not, pursuant to the provisions of § 126, (1) receive a "message" from the Governor (2) have the bill "returned" to it (3) consider the Governor's "objection," or (4) repass the bill over the Governor's veto. The Governor has not presented a sufficient reason or argument for us to interpret § 126 in a manner that would effectively serve to deny enforcement of its provisions described immediately above. Accordingly, considering all the arguments, we hold that § 126 does not authorize an Alabama Governor to item-veto an appropriations bill after the legislature has adjourned sine die.
We expressly reject the argument that some combination of the provisions of §§ 125 and 126 can be construed to create authority for the Governor to exercise a post-adjournment item veto. At the same time § 125 was amended to provide the Governor 10 days after the legislature's final adjournment within which to approve legislation passed in the five days before the legislature's final adjournment, § 126 was amended to require expressly that the Governor's item veto be set out in a message. This combination of amendments indicates that the grant to the Governor of additional time to approve legislation did not authorize an extension of time beyond *Page 860 
the legislature's final adjournment for him to exercise the item veto.
The trial court did not err in its judgment. That judgment is due to be affirmed.[4]
1901902 — AFFIRMED.
1901903 — AFFIRMED.
1901904 — AFFIRMED.
1901905 — AFFIRMED.
1901906 — AFFIRMED.
1901907 — AFFIRMED.
HORNSBY, C.J., and ALMON, SHORES, ADAMS,* STEAGALL and INGRAM, JJ., concur.
MADDOX, J., concurs specially.
HOUSTON, J., concurs in the result.
[1] House Bill 203 became Act No. 91-732.
[2] "Enrolled bill" means the final copy of the bill that the legislature has passed; it is presented to the Governor for his signature.
[3] Former Governor Jones, chairman of the Convention's committee on the executive department, did mention the reason for adding the clause that we have numbered "3":
 "MR. JONES (Montgomery [County]) — The next Section is Section 14. I desire to state in behalf of the Committee that the only change in that relates to a question of practice. The present Constitution says the Governor can veto a specific item of an appropriation bill and the question then arose as to whether it was his duty to send the bill back with his message and as he has already approved the bill, the opinion seemed to be that it had no business back in the House and this provides that in his message he shall set out specifically the item to which he objects and file the bill with the Secretary of State instead of returning it to the House." Official Proceedings, Vol. 1, p. 682.
The clear import of these remarks is that the committee was concerned about the return of a signed act to the legislature. Therefore, its decision was that the approved portion of the bill would be sent to the Secretary of State and the vetoed items would be returned to the legislature along with the Governor's objections to them. Those remarks appear to contemplate an item veto only during the session.
[4] Although it might otherwise have been unclear, the Governor stipulated that had he not believed that he had the authority to veto portions of Act No. 91-732, he would have approved the entire bill. Accordingly, there is no issue as to whether the Governor would have "pocket vetoed" the entire bill in order to invalidate the portions he disapproved rather than have those portions become law.
* Although Justice Adams did not attend oral argument, he has studied a recording of that argument.